# EXHIBIT H

SARD VERBINNEN & CO

ILLINOIS SENATE HEARINGS

ENVIRONMENT AND CONSERVATION COMMITTEE HEARING

CHAIR: SEN. DAVID KOEHLER

PANEL 1: JEN WALLING, JEAN HOLHALTER,

URSULA TANNAWAY

PANEL 2: DONOVAN GRIFFITH (IMA), BRAD BABCOOK,

DR. JANE TATA, THOMAS TRIMBLE

SPEAKERS: SEN. JOHN CURRAN, SEN. MELINDA BUSH,

DIR. ALEC MESSINA (IEPA)

PRODUCER: (NOT IDENTIFIED)

MEDIA ID: STERIGENICS-HEARING-3.MP4

* * *TRANSCRIBER'S NOTE: BACKGROUND NOISE THROUGHOUT; ONLY TRANSCRIBED IF

PARTICULARLY INTRUSIVE. COMMITTEE MEMBERS REFER TO ONE COMPANY AS VANGUARD

UNTIL SEN. BUSH IS CORRECTED WITH VANTAGE ON PAGE 110. * * *

ON-SCREEN TEXT:

00:00:00;06              Illinois Senate Environment and Conservation

                         Committee Hearing

                              SEN. DAVID KOEHLER, CHAIR:

00:00:00;13              (IN PROGRESS) --here's what we're gonna do in the

                         subject matter hearing. We're gonna ask-- Senator

                         Curran to make-- an opening statement. We'll ask-

- Senator Bush-- please add Senator Bush to the roll. We'll ask Senator Bush to-- also make an opening statement. And then we're gonna have three panels-- the first-- representing environmental concerns-- and residents of the affected areas.

00:00:23;04        Secondly, we'll have-- people representing the industry-- talk. And then third, we'll have-- Director Alec Messina from EPA-- give some remarks. Please add Senator Morrison to the-- roll. And-- during the-- after-- after the panels-- each panel-- makes testimony, then-- I will open it up for questions from the-- committee. We're asking each panel to-- keep your remarks within-- a ten-minute-- timeframe-- so that we can try to-- get through this-- expeditiously as possible. We are not going to take any action on this. This is a subject matter hearing only. So, Senator Curran, welcome.

SEN. JOHN CURRAN:

00:01:05;15        Thank you, Mr. Chairman. I want to thank all the

members of the committee this morning for your--
time and attention on this very-- important
matter, not only in my district, but-- throughout
the state of Illinois. I-- I want to tell you,
back in late August-- when the U.S. EPA notified
the village of Willowbrook about-- heightened--
heightened concerns that they had with the--
emissions coming from Sterigenics-- related to
ethylene oxide, a compound that's used to
sterilize-- many products-- including-- surgical
equipment.

00:01:44;01          The village of Willowbrook, the surrounding
communities have really become paralyzed in fear.
I mean, we are talking health, safety of the most
vulnerable in our population. And we-- we-- we
currently-- the more you dig into this, you
realize that this is-- very scary stuff and this
is-- you know-- a great public concern.

00:02:07;12          You know, I-- I do-- want to compliment the--
Illinois Department of Public Health, who has

come in to do a-- cancer study in an expedited

manner on this c-- in-- in this area. And that's

gonna be completed-- we hope by the beginning of

March. I have worked-- with the Illinois

Environmental Council, with-- Senator Bush-- on

some proposed legislation.


00:02:32;08          You have two pieces of legislation before you--

this morning-- as-- as we begin to work on this

product-- work on this topic and try to really

dig in and-- determine what, if any-- levels of--

or emissions of ethylene-- oxide are appropriate

in our communities. The legislation-- I've put

forward-- contemplates-- no emissions of ethylene

oxide by 2022 in the state of Illinois as-- this

is not a-- a safe-- toxin to be released into the

air-- being that it is a known carcinogen. So, I-

- I think you for your-- your time and attention

this morning. And I know you have-- several

panels-- that are gonna come up and provide

further context. So, thank you, Mr. Chairman.

                                          SEN. DAVID KOEHLER, CHAIR:

00:03:21;18              Thank you. Senator Bush?

                                          SEN. MELINDA BUSH:

00:03:25;16              (NOISE) Thank you very much-- Mr. Chairman. Thank

                        you, Senator Curran. This-- issue really expanded

                        lately. And certainly not that it isn't a large

                        enough problem-- in the district that Senator

                        Curran represents-- it is-- you know, we are now

                        aware that both-- Vanguard and Medline-- in Lake

                        County-- are emitting-- ethylene oxide.


00:03:49;14             What we need to get at is is there a safe,

                        acceptable level, what that is-- and make sure

                        that, first of all, public safety is the

                        priority. You know, it has to be the priority

                        going forward-- but we also have to understand--

                        I mean, I, you know, feel like this is-- I'm

                        really happy to be here today. There's a lot to

                        learn-- about ethylene oxide.


00:04:15;17             And I-- I think there's just gonna be a lot of

                        questions. I'm really happy to be working with

Senator Curran. I called him immediately-- and

signed onto his bill. I'm happy to provide any

support to move that bill forward. This will be

a-- bipartisan effort-- to do what is right-- for

the people that live in the state of Illinois.

So, thank you.

SEN. DAVID KOEHLER, CHAIR:

00:04:36;28          Thank you very much. So, would the first-- panel

please come up and-- take your seat? I'll have

you introduce yourself. Again, for the committee-

- we're asking each panel to-- take ten minutes--

make their remarks, and then we'll open it up for

any questions that you might have. So-- welcome,

panel, and please introduce yourself.

JEN WALLING:

00:04:55;26          Good morning. My name is Jen Walling. I'm the

executive director of the Illinois Environmental

Council. And I am going to be very short because

I'd like Ursula and Jean, who are local

residents, to be able to offer their testimony

and personal experience with this.

00:05:09;18          But I'll just say I know all of you know me from

                     being in front of this committee many times, but

                     in addition to being an issue that I care deeply

                     about-- preventing cancer in Illinoisans-- I grew

                     up in Deering, Illinois, less than two miles from

                     this facility, at a time where it was emitting

                     ten times the ethylene oxide that it is today,

                     and my mother had a breast cancer when I was a

                     child.


00:05:31;13          And I can't tie my mother's cancer to this

                     particular facility-- but we do know that

                     ethylene oxide does cause cancer at such a rate

                     that no level ex-- of exposure has been

                     identified as safe. This bill that's been

                     presented today, Senate Bill 3640, that we worked

                     with Senator Curran to draft, is also a

                     compromise.


00:05:52;06          It's not something that bans ethylene oxide

                     emissions immediately. And we know that that's

                     what the folks who live in the community-- both

in DuPage and Lake County, want to see because

that is the safe level-- of ethylene oxide. So,

what we are already presenting, the phase out

that we're working at is-- is already presenting

a compromise, but we understand that local folks

want this banned-- immediately.

00:06:16;23          The bill that Senator Curran's put together is--

a phase out in different approaches that we can,

if you have questions-- you know, to-- be

replaced by other alternatives. But it also

includes really important provisions, and I--

think when other speakers are up, you should ask

questions about this-- to give the IEPA overall

tools to reopen air permits when there is a

public health hazard, because that's been one of

the issues that's happened today.

00:06:43;21          This type of issue could happen in any of your

districts, at any time, and we would be unable to

reopen air permits to adequately address the

issue quickly. And that's what Senator Curran's

bill-- does and why it's very important to this
issue statewide. So, I'll let these speakers--
from the community address the issue.

SEN. DAVID KOEHLER, CHAIR:

00:07:03;18          Yes, and please identify yourselves.

JEAN HOLHALTER:

00:07:05;28          Hello, my name Jean Holhalter (PH). I grew up in
Burr Ridge, Illinois, which is an adjoining town
to Willowbrook. I currently live in Naperville,
Illinois. In 2001-- or I'm sorry, in 2011, I was
newly remarried. My son was prospering in high
school and life was just looking absolutely
fantastic. It was very exciting.


00:07:27;18          But in August of 2013, we were dealt a very
brutal blow. A piece of paper delivered my fate,
invasive aggressive lobular ductal carcinoma.
Please close your eyes for a minute and imagine
your child or small child that you love, and
having to tell them that you have cancer. This is
a child I raised on my own. We did not know for
some torturous time whether I would live or

whether I would die.

00:08:03;13          I didn't know if I would get to see my son
                     graduate from high school, select a college,
                     graduate from college, get married, have a child.
                     Those were all my big (UNINTEL) in life. That's
                     what I-- that's what I wanted. I have no family
                     history of cancer. I do not carry the BRCA gene
                     or genetic mutations. There was no reason for me
                     to have breast cancer.

00:08:28;29          I did, however, breathe in the toxic emissions of
                     ethylene oxide, which Sterigenics had willfully
                     and is still spewing out into our community at
                     time-- at rates that are unacceptable. I lived in
                     Burr Ridge from 1967 to 1992, living, working,
                     and attending school all within a one-mile radius
                     of this company. I was breathing in toxins, we
                     didn't even know how much. My parents believed I
                     was safe while growing up. That's-- that leant
                     itself to be very untrue.

00:09:04;15            The real harm from ethylene oxide comes from
                       long-term and chronic exposure. Until recently, I
                       did not know the extent of the damage ethylene
                       oxide had potentially on my life. Back in 1995, I
                       was so excited to have my first baby. We chose
                       names. We bought baby clothes, prepared for-- for
                       parenthood with great excitement. I lost my first
                       baby due to fetal abnormalities for unknown
                       reasons and did not know if I could have a
                       healthy child.

00:09:39;02            Until-- until recently, I did not know the extent
                       of the damage from ethylene oxide, until I looked
                       (LAUGH) back in August, I-- I looked at the list
                       of all of the issues that ethylene oxide
                       produces-- and medical issues, and we just
                       checked 'em off one by one. It was so scary, so
                       sad, and I became very angry.

00:10:04;06            Eighteen years later, after my miscarriage, we
                       received the news of my breast cancer diagnosis.
                       Hearing the word cancer changes your life in

unimaginable ways, and ways that you can't
imagine until it happens to you. My potential
killer is faceless, odorless, tasteless. It's
very explosive, because ethylene oxide is very
explosive, and it has a name-- ethylene oxide.

00:10:32;01          My body was ravaged by a double mastectomy. I am
permanently disfigured. The physical pain I have
endured is more than most people can imagine. The
mental anguish that has accompanied my cancer
diagnosis has been through the roof. From the day
of my diagnosis forward, I have struggled with
P.T.S.D., anxiety, and my body is almost always
in fight or flight mode. However, it's-- it's
very-- a horrific way to live, not knowing if
you're going to get cancer again. That thought is
always there, always there. You can never escape
it.

00:11:11;07          Every day, that's my reality. That's how I have
to live. Going through chemo, I lost my hair, I
lost my eyelashes, I lost my eyebrows, I lost my

mojo, and I lost my dignity. Since 2013, I've had
about 15 major surgeries, with many more to come.
Additionally, I've suffered from chronic up--
upper respiratory, reproductive, and GI issues
since about 1984 or '85, which coincidentally is
when Sterigenics came to town.

00:11:45;15          In August of this year, like I said, I was
horrified to read the list of all of the issues.
And I'm-- one example of the prolific number of
cancer victims in our area. There are children
fighting for their lives because they have
developed leukemia, lymphoma, and other cancers.
How many lives have to be lost to this killer?

00:12:08;23          EtO sterilization firms are not philanthropic
organizations. They are for-profit companies that
reap financial benefits while they cause billions
of dollars in damage-- to public health and loss
of property. When are the EPA and those who
condone the usage of ethylene oxide in a highly
concentrated residential area and community going

MEDIA ID: STERIGENICS-HEARING-3.MP4                              PG. 14

to be held accountable? These beads are called the beads of hope. This little girl is a community member, okay. She's holding her beads of hope.

00:12:49;18          This represents about 1,000 of 'em, okay. It's 24-feet long. This girl had over 5,000 of 'em when she stopped counting. This little girl, again, this little boy should be down at-- at-- I think Alabama, Roll Tide. He's at home now. He can't work, go to school, or anything for a couple of years because he has leukemia, lived in the-- area for a long time. This poor lady lived in the area for a long time. She has-- has-- cancer. You know, here I am after breast cancer. And here's this little baby, innocent, didn't do anything wrong, okay. She has cancer.

00:13:48;15          I implore you, on behalf of the large number of cancer sufferers, their loved ones, and those suffering from a myriad of-- serious health issues attributed to ethylene oxide in Illinois,

ban ethylene oxide usage. There is no safe amount. People will come in here and tell you there are safe amounts and that they're in compliance. There is no safe amount. Zero.

00:14:16;06          This should be a zero tolerance. You have the power to make the changes, to save our lives. Do not allow companies to profit on the backs of the children and people they are harming and killing. And they are harming and killing us. (SIGH) How many more people have to suffer mentally and physically before you, our legislators, make laws banning the toxic use of EtO? The public has more of a right to breathe clean air, live their lives without fear, than Sterigenics and companies using EtO have to make a profit at our community members' expense. Needles, syringes, tubing are all disposable. Children and humans are not. Do right by your constituents, please. Human safety over profits, it's the only conscionable decision you can make. Thank you.

                                SEN. DAVID KOEHLER, CHAIR:

00:15:26;18          Thank you. And--

                                URSULA TANNAWAY:

00:15:30;17          Good morning. And thank you for--

                                SEN. DAVID KOEHLER, CHAIR:

00:15:31;27          Your name? Your name, please?

                                URSULA TANNAWAY:

00:15:34;11          My name is Ursula Tannaway (PH). Thank you for

                     providing us the opportunity to participate. I'm

                     a member of Stop Sterigenics Movement-- that

                     formed when we found out that ethylene oxide was

                     being spewed into our community. My family has

                     lived in the surrounding area since 1989.


00:15:53;09          Today, I'd like to talk about some numbers and

                     what we can do about them. Ethylene oxide is a

                     potent human carcinogen. It always has been. To

                     echo Dr. Susan Buchanan's assertion at the

                     General Assembly committee hearing on October

                     26th, there is no safe level of exposure to a

                     carcinogen.

00:16:12;04                 We think about exposure in terms of acceptable

                            risk. According to the EPA, the acceptable risk

                            for a single carcinogen is one incidence of

                            cancer in one million people. At 100 in a

                            million, action is considered. In 2016, 24

                            specialists and 14 government agencies or

                            divisions worked together to update the way the

                            EPA calculates the health risk associated with

                            ethylene oxide to better match the current

                            scientific understanding.


00:16:43;11                 These are people whose interest is public health

                            and safety. Bear with me, I'm gonna give you some

                            numbers. I've converted the units to make them

                            easier to compare in case you've been reading

                            about ethylene oxide and see some zeroes in

                            different places and some different units. The

                            concentration of ethylene oxide that is

                            calculated to give a one in a million estimate--

                            (BACKGROUND VOICE) sure, I'm gonna flip through

                            them-- is .2 nanograms per meter cubed.

00:17:12;12                One hundred in a million is 20 nanograms. The

                           NIOSH Recommended Exposure Limit is 180

                           nanograms, time-weighted average for an eight-

                           hour work day. OSHA's limit is 1,800 nanograms,

                           time-weighted average for an eight-hour work day.

                           Both recommend limits of 9,000 nanograms, for a

                           maximum of 15 minutes per day.


00:17:37;15                These values assume workers are only exposed at

                           work, under controlled conditions. They also

                           factor in the ability to measure exposures at

                           those levels. According to self-reported stack

                           emissions data from Sterigenics for 2014, when

                           they claimed to have been operating at a 99%

                           emissions reduction rate, the Nada (PH) models

                           estimate a maximum air concentration of-- have I

                           got-- do I have the right one? Of 76 nanograms

                           near Sterigenics.


00:18:11;00                That corresponds to a cancer risk of between 250

                           and 350 per million, depending on whether you use

                           the raw or adjusted estimate. In May 2018, the

measured amounts in residential areas near
Sterigenics were as high as 2,100 nanograms per
meter cubed. In the office park, a measurement of
9,100 nanograms was recorded. In June,
Sterigenics updated their controls and tested
them in September.

00:18:40;26          In October, a nearby private company measured an
indoor ethylene oxide concentration of 1,700
nanograms. Why is there such a discrepancy
between estimates based on stack data and
measured concentrations? Something isn't right.
Our community members have been reporting many
symptoms that support the measured ambient air
amounts. Several children in pro-- in close
proximity to Sterigenics have had tumors removed
or are cancer survivors, elementary school
children.

00:19:14;23          Adults and children report chronic headaches,
gastrointestinal distress, respiratory disease,
eye irritation, multiple miscarriages, and of

course cancers. Emissions have not-- emissions

controls have not kept our community safe or

healthy. We've known for decades that there are

significant health risks associated with exposure

to ethylene oxide, including, but not limited to

cancers.

00:19:38;15          Industry is arguing about how much additional

poison is okay for our families, our children to

breathe. We've seen this before with lead, with

asbestos, with smoking. It's time we change the

way we think about these substances. It's time to

stop thinking about how much risk is acceptable,

how many loved ones we lose to acceptable risk.

It's time to start justifying why using ethylene

oxide is actually required and to relocate

facilities that do this away from densely pop--

populated areas and notify any residents in those

new locations.

00:20:16;20          SB-3640 tries to do that. It asks industry to

take a good, hard look at why they're poisoning

people and make real progress to switching their

supply chain to alternative methods. Hospitals

across the U.S. have been doing this for years.

It's time we push the supply chain to switch,

too, because they won't switch from this

artificially cheap method or move their

operations until we force them to. Thank you.

SEN. DAVID KOEHLER, CHAIR:

00:20:45;13        Thank you both for your testimony. We'll take a

few minutes to see if there's any questions--

Senator McGuire? Would you please add-- Senator

Biss to the roll? Senator McGuire?

SEN. PAT MCGUIRE:

00:20:57;06        Thank you, Mr. Chair. Thank you to all three of

your-- for your testimony. And Senator Curran,

you mentioned that there's an IDPH cancer study

that's due in March. Have there been any--

epidemiological studies done in the past by any

state or federal agency?

SEN. JOHN CURRAN:

00:21:15;16        For this particular area, no, Senator.

                              SEN. PAT MCGUIRE:

00:21:18;23          Okay. And Jen Walling, you mentioned that ste--

                     Sterigenics once emitted ten times the present

                     level of EtO. What caused the reduction?

                              JEN WALLING:

00:21:31;16          So-- and I am-- I've got some of those numbers on

                     it from the '80s. Some of it was increased

                     emission standards-- over time. So-- and we, even

                     in this past year, there have been increases in--

                     in the permit-- or decreases in what they're able

                     to emit by their permit.

                              SEN. PAT MCGUIRE:

00:21:47;25          Are those fed-- are you talking about federal EPA

                     levels?

                              JEN WALLING:

00:21:50;09          Yes.

                              SEN. PAT MCGUIRE:

00:21:50;11          Illinois EPA levels?

                              JEN WALLING:

00:21:52;09          Federal.

                              SEN. PAT MCGUIRE:

00:21:53;06          Okay. And has there been any enforcement action,

MEDIA ID: STERIGENICS-HEARING-3.MP4                                      PG. 23

                    any fines, any cease and desist orders ever

                    against Sterigenics?

                            SEN. JOHN CURRAN:

00:22:04;15          In 2013-- there was action taken by the Illinois

                    attorney general and the Illinois EPA-- with

                    regards to-- ethylene glycol, which is--

                    antifreeze-- a large leak. And they also had-- a-

                    - a-- an unscrubbed emission of-- of ethylene

                    oxide-- into the air at that time as well-- and

                    they were-- ultimately they were fined in 2015

                    through the-- process-- after filing in-- circuit

                    court of DuPage County.

                            SEN. PAT MCGUIRE:

00:22:35;00          So, in 2015, Sterigenics was fined by the federal

                    EPA?

                            SEN. JOHN CURRAN:

00:22:39;21          No-- Illinois EPA.

                            SEN. PAT MCGUIRE:

00:22:41;02          Oh, Illinois attorney general for an excessive--

                            SEN. JOHN CURRAN:

00:22:43;00          Illinois attorney general, yes, for--

MEDIA ID: STERIGENICS-HEARING-3.MP4                                    PG. 24

                                    SEN. PAT MCGUIRE:
00:22:44;01          Excessive emission of EtO?

                                    SEN. JOHN CURRAN:
00:22:45;11          Emission and also a toxic spill-- in the-- in--
                     in the ground as well. And I-- I-- if I could
                     very quickly--

                                    SEN. PAT MCGUIRE:
00:22:52;09          Yeah.

                                    SEN. JOHN CURRAN:
00:22:53;20          --add-- the Illinois EPA and the-- DuPage County-
                     - Health Department recently announced that
                     they're gonna be testing all the-- they're gonna
                     be doing water well-- test samples in the area as
                     well.

                                    SEN. PAT MCGUIRE:
00:23:05;24          Thank you. And-- workplace exposure-- exposure
                     inside the plant? Is there any record of OSHA
                     inspections, OSHA enforce-- enforcement, NIOSH
                     health hazard evaluations?

00:23:18;07                          (OFF-MIC CONVERSATION)

                                    JEAN HOLHALTER:
00:23:27;21          Sterig-- well, let me go back. Sterigenics has--

a history of many violations across the world, and many ex-- factory explosions. As far as OSHA, we're still studying that. We're-- we're highly looking into this. So-- and I think Ursula has a scientific background, I believe, so you know, we're-- we're studying this. We're trying to get the information.

URSULA TANNAWAY:

00:23:53;16          We'll-- we'll-- we'll get you what information we can-- about OSHA violations, if there's more to get you.

SEN. PAT MCGUIRE:

00:23:58;11          Okay. Do employees at Sterigenics belong to a union?

JEN WALLING:

00:24:02;27          So, I'm not sure at the particular facility, but we do know that some of the SCIU healthcare workers are impacted by ethylene oxide emissions because they work in some of the facilities that do this and-- and have to-- you're given a lot of precautions if you're working with ethylene oxide in-- in a hospital or other facility.

                              SEN. PAT MCGUIRE:

00:24:22;24          Okay. And Ursula, I appreciate the information

                     you gave us about-- the NIOSH recommended TLB and

                     OSHA's concern-- current TLB (UNINTEL) or those--

                     those are eight-hour time-weighted averages,

                     right? So, I noticed that NIOSH's recommended

                     eight-hour TW-- yeah, time-weighted average is

                     1/10 of the current OSHA standard.

                              URSULA TANNAWAY:

00:24:44;12          Yes.

                              SEN. PAT MCGUIRE:

00:24:45;00          Which indicates that research suggests that the

                     OSHA limit should be reduced.

                              URSULA TANNAWAY:

00:24:50;25          Yes. And this is not recent. This was-- I don't

                     even remember the year. It was late '90s, early

                     2000s. This has been a standard by NIOSH for a

                     long time.

                              SEN. PAT MCGUIRE:

00:25:01;27          Okay. And-- correct me if I'm wrong, so it's not

                     a standard; it's a recommendation.

                              URSULA TANNAWAY:

00:25:05;24          It's a recommendation officially.

                              SEN. PAT MCGUIRE:

00:25:07;05          Okay. Well-- is there a separate-- separate from

                     the NIOSH recommendation and the current OSHA

                     standard, is there an EPA standard for extramural

                     emissions?

                              URSULA TANNAWAY:

00:25:22;22          As far as I've been told, there are no standards

                     for ethylene oxide emissions. There are

                     recommendations. But somebody more versed in

                     regulations should probably speak to it than I.

                              SEN. DAVID KOEHLER, CHAIR:

00:25:35;19          We will have Director Messina--

                              SEN. PAT MCGUIRE:

00:25:36;26          Okay.

                              SEN. DAVID KOEHLER, CHAIR:

00:25:37;29          --at the very end, so--

                              SEN. PAT MCGUIRE:

00:25:38;07          All right. Thank you. And-- oh, Jen, you

                     mentioned-- you advocate a phase-out of EtO and

                     that it be replaced by alternatives. Are there

alternatives?

JEN WALLING:

00:25:49;06        Yes. And I can give you-- you know, there's

actually-- some information that's been compiled

by physicians on the different alternatives. And

we have had some discussions-- I mean, I think

they're gonna talk today. You know, the Hospital

Association-- I-- I hope I'm not speaking out of

turn, and they'll give this information, that--

the hospitals themselves are typically just using

ethylene oxide canisters and they have been

working on phasing that out and feel like they

need a time period.


00:26:16;24        But in hospitals, they feel like they can phase

out ethylene oxide usage there. They have

alternatives that they're using for the in-

hospital sterilization. And we feel there are a

number of-- alternatives that can be used-- for

the type of equipment. You know, a lot of this

may be-- you know, metal can have a different

type of sterilization, it's my understanding,

MEDIA ID: STERIGENICS-HEARING-3.MP4                                    PG. 29

than, like, rubber or plastic.

00:26:42;12         So-- there are numerous alternatives that can be
                    used. I mean, of course, for the plants
                    themselves, that's going to be-- a costly
                    turnover to create those alternatives, but-- for
                    something that is safer. So, there are-- there's
                    copious alternatives. We've proposed a phase-out
                    that-- bans it by 2022, but we know, you know,
                    the residents locally want this shut down
                    immediately.

                              SEN. PAT MCGUIRE:
00:27:08;20         All right. Thank you.

                              URSULA TANNAWAY:
00:27:09;20         And if I could add-- we know of several hospitals
                    in the area that have voluntarily discontinued
                    all use of ethylene oxide on their premises. One
                    is St. Anthony's and another is Swedish co--
                    Covenant. And those are both in the Chicago area.
                    There were a few in California that we read about
                    that have also done so.

MEDIA ID: STERIGENICS-HEARING-3.MP4                                    PG. 30

00:27:31;02          And they have replaced them with equivalent

                     alternatives-- that they've seen a lot of

                     benefits because the cycle times are faster, the-

                     - the emissions are non-toxic. They're water

                     vapor, carbon dioxide. So, this has been done in

                     hospitals in the U.S.

                                SEN. PAT MCGUIRE:

00:27:49;05          Thank you.

                                SEN. DAVID KOEHLER, CHAIR:

00:27:50;05          Dave Dahl (PH) requests-- being able to take

                     photographs. Without any objection, we'll grant

                     that. Senator Oberweis?

                                SEN. JIM OBERWEIS:

00:27:57;04          Thank you, Mr. Chairman, and thank you to all of

                     you for taking the time to-- to testify here this

                     morning. I think a lot of us believed or hoped

                     that-- this kind of stuff doesn't happen in the

                     United States anymore, but obviously that's-- not

                     a good-- assumption. I just-- I just have a

                     couple of quick questions. First of all, is this

                     a public company, do you know? Sterigenics? Or is

                     it a private company?

MEDIA ID: STERIGENICS-HEARING-3.MP4                                    PG. 31

                                        JEAN HOLHALTER:

00:28:22;01            Right now, it's a privately held company. They

                      did try to go public at one point and they

                      withdrew their SEC--

00:28:29;05                            (OVERTALK)

                                        SEN. JIM OBERWEIS:

00:28:29;20           I can see why.

                                        JEAN HOLHALTER:

00:28:30;06           Yeah, I can see why as well.

                                        SEN. JIM OBERWEIS:

00:28:34;29           Secondly, do we know-- were they invited to come

                      here-- and-- and present some-- some--

                                        SEN. DAVID KOEHLER, CHAIR:

00:28:41;04           Yeah, there's--

                                        SEN. JIM OBERWEIS:

00:28:41;07           --opposition argument or case?

                                        SEN. DAVID KOEHLER, CHAIR:

00:28:42;14           They're up-- they're up next.

                                        SEN. JIM OBERWEIS:

00:28:43;22           They are here?

                                        SEN. DAVID KOEHLER, CHAIR:

00:28:44;02           Yes.

                              SEN. JIM OBERWEIS:

00:28:45;07            Okay. I think the last question I have is-- do we
                      have an idea of how far this-- could affect
                      people? I mean, is this something that affects
                      people within a quarter of a mile or a mile or
                      three miles or--

                              JEN WALLING:

00:29:01;27            So, that's very interesting. As I mentioned
                      earlier, when the-- the NATA report-- produced an
                      interactive map. It's really cool. You can go in
                      there and move around and find your particular
                      address. You can look around at your
                      neighborhood. You can zoom out and see regional
                      things.


00:29:21;04            And using the self-reported stack test data, so
                      s-- Sterigenics reports an amount that they
                      expect that they've emitted-- the NATA report
                      calculated a concentration that was on the ground
                      and then extrapolated some-- or calculated the
                      health associated risks. The splotch on our map
                      is huge. It cover-- covers several square miles.

And it trends with the winds toward the northeast.

00:29:49;21    So, that number that I gave earlier, this one, is what Sterigenics reported. The number that was measured in May of this year and in October is this one on the ground. So, there-- there is something wrong here. Either the-- I'm sorry, I'm (UNINTEL) all over here. Either the-- the stack reporting is incorrect or the air modeling is incorrect or these measurements are incorrect.

00:30:23;17    I tend to think it's this number that's incorrect because we have the biological data of people who are on the ground, affected by these emissions, that support symptoms that fall within this range if you look at symptoms that are associated with various concentrations in the workplace. So, we already know what kind of things are associated with high-- higher level emissions and they're matching.

                         SEN. JIM OBERWEIS:

00:30:48;25          Thank you very much. And-- I'm sorry, one last

                     quick question. You mentioned St. Anthony, but I

                     didn't hear what you were saying about that, and

                     I have a daughter who's a nurse at St. Anthony.

                     Could-- could you just tell me what that was in

                     regard to?

                         JEN WALLING:

00:30:58;21          So, at-- since-- there were two hospitals that

                     were named in supplemental data. If you-- go

                     into-- the NATA report is huge and they talk

                     about ethylene oxide emissions all over the

                     region. The big splotch is ours from Sterigenics,

                     but there are also some smaller point sources.

                     And those, if you scroll over them, they're

                     mostly hospitals.


00:31:20;03          One of the things that they noted in their

                     supplement, because this data was taken in-- from

                     2014 reports, is that in late 2014 and in 2015,

                     there were two area hospitals, St. Anthony's was

                     one of them, Swedish Covenant was another, that

voluntarily discontinued their use. So, what
comes up on the map as this cancer risk in those
areas should be modified because they no longer
use the ethylene oxide they-- they reported in
2014.

SEN. JIM OBERWEIS:

00:31:46;21      Thank you. Thanks very much.

JEN WALLING:

00:31:48;07      Sorry, long story short.

JEAN HOLHALTER:

00:31:49;11      May-- may I make one comment about the
dispersion? In Lisa Madigan's complaint against
Sterigenics, she mentioned a Whitaker Park. That
is literally right next door to my parents'
house. So, you know, that's a mile as the crow
flies. And my legal team has said that, with
their dispersion experts, it goes far beyond. So-
-

SEN. DAVID KOEHLER, CHAIR:

00:32:13;20      All right. Thank you very much to this panel. The
next panel-- represents-- I don't-- I'm not sure
that Sterigenics is-- represented in--

specifically, but there are people from the
industry that are gonna be-- testifying. So--
will the second panel please-- come up.


00:32:29;29          Since we took about-- 25 minutes with--
questions-- from the committee as well-- we'll
try to-- be fair to-- this panel as well. About
half that time will be used for your testimony
and then we'll open it up for-- additional
questions from the committee. So, please--
identify yourself as you speak.

DONOVAN GRIFFITH (IMA):

00:32:49;09          Thank you. Thank you. My name is Donovan
Griffith. I'm the director of government affairs
for the Illinois Manufacturers' Association. I'll
be very brief 'cause we actually have experts
here with us today, especially an expert-- in EO
or EtO-- however you look at it, for ethylene
oxide.


00:33:04;28          As it stands right now, the Illinois
Manufacturers' Association is opposed to Senator

Curran's two bills. We do not believe that a ban
of ethylene oxide is necessary. The science that
has been used to get us to this point in the U.S.
EPA reports and in their risk assessments is
flawed. They, themselves, in doing the reports,
have admitted to assuming a lot of data. The risk
level set for ethylene oxide is flawed, as it was
taken out of those reports.

00:33:31;08      So, we do not believe a ban of ethylene oxide is
necessary. So, as it stands, we-- we are also--
we have had one stakeholder conversation with
Senator Curran-- yesterday. I believe there are
more to come. So, while we are opposed to the two
bills, we do-- look forward to working with him
and continuing those conversations.

                 BRAD BABCOOK:

00:33:50;17      Thank you, Donovan. Thank you, Mr. Chairman and
members of the committee. I'm Brad Babcook, on
behalf of the Chemical Industry Council of
Illinois. Before turning this over to-- to Dr.
Tata and Mr. Trimble here to discuss the science

and what some perceive as alternatives, I just
want to make a few brief-- yeah, I just wanted to
make a few brief-- remarks.

00:34:08;24          Aside from the 1% of ethylene oxide that's
actually used in the sterilization, the rest is
used in-- a whole host of different
manufacturing-- processes-- that-- that my
members use. Some are at non-detectable limits.
And I have even one-- member in-- in particular
that doesn't even emit this into the atmosphere.

00:34:27;13          This bill would actually ban all uses of that
immediately. So, I just wanted to reiterate--
Donovan's comments to that. You know, we--
continue to-- talk with, you know, meet with the-
- with the sponsors of the bills, both in the
House-- House and the Senate, and see if there
is-- is some type of common ground-- that can be
reached. But-- but with that, I think it's really
important really to kind of focus this discussion
now on the actual science and-- like I said, what

some perceive as-- as-- as alternatives. So, with

that, I can turn it over to Dr. Tata.

DR. JANE TATA:

00:34:58;10    Good morning. My name is Jane Tata. I'm--

SEN. DAVID KOEHLER, CHAIR:

00:35:01;05    Can-- can you speak right into the microphone so

everybody can hear? Thank you.

DR. JANE TATA:

00:35:04;24    I am a principle epidemiologist at Exponent, a

scientific con-- consulting company based in

Menlo Park, California. I received both my

master's and doctoral degrees from Yale

University, where I majored in biostatistics for

my master's and chronic disease epidemiology--

for my doctorate.


00:35:25;13    I've been an occupational epidemiologist for 40

years, 35 years of which I have focused

extensively on ethylene oxide, both conducting

research studies and risk assessments and working

with government agencies. I've been on the ATSDR

Board of Scientific Counselors for four years.

I've been on the EPA-- I've been a consultant to the EPA Scientific Advisory Board, and many other associations with government scientists.

00:35:57;02          I'm here at the request of Medline, to offer my opinions regarding the findings of ethylene oxide worker health studies and how and why these findings are contrary or inconsistent with the U.S. EPA ethylene oxide cancer assessment. I just want to clarify that the ATSDR report that you heard about, the NATA report that you heard about, the foundation of those two reports are this EPA cancer risk assessment. And that's the focus of my comments.

00:36:32;26          And I thank you for the opportunity to be here today, to hopefully clarify some of these scientific issues. Let me jump to the main point of my remarks. The EPA risk assessment is flawed and it should not be used as it has been used to predict cancer risks of any kind. I'll outline three reasons why I hold this opinion. The EPA

report that calculated this risk assessment was
based on a faulty exposure response model.

00:37:05;29          By that, I mean the agency has to try to model
data showing the relationship between exposure
and risk. It is my opinion they have a faulty
model for doing that. And we'll talk a little bit
more about that. In addition, the EPA used the
NIOSH study exposure estimates for workers that
were-- were estimated implausibly lower in the
early years of the sterilin (PH) industry.

00:37:37;19          NIOSH study estimated exposure in the early years
where there was no data. And their estimates show
higher-- lower levels in the early years. Really,
that is not-- plausible. We know-- everything we
know is that exposures were higher in the early
years. In addition, the report used only one
study in their statistical analysis and they
ignored contradictory research. And I'll talk a
little bit more about that.

00:38:08;12          Now, let's focus on what-- what have we learned
                     from human studies of ethylene oxide workers?
                     There are a large number of studies published
                     over a 40-year period in the U.S. and in numerous
                     European countries. There is no pattern of
                     increases for any type of cancer among the 13
                     studies, which included over 34,000 ethylene
                     oxide workers, both in sterilin operations and in
                     manufacturing.


00:38:39;16          And isolated increased risks seen are of small
                     magnitude and based on small numbers. And there
                     is no-- and this is very important, there is no
                     clear increase in risk with greater exposure.
                     That is a pattern you look for with a carcinogen.
                     More exposure, more risk. The limited human
                     evidence-- limited in the sense of evidence of
                     carcinogenicity, and the one relied on in the EPA
                     and their assessment, comes from a large study of
                     sterilin workers conducted by the National
                     Institute of Occupational Safety and Health,
                     NIOSH.

00:39:19;29                    The evidence of cancer risk was limited and the
                               conclusions of the study authors were not
                               definitive. The NIOSH worker communication, after
                               the completion of their study, noted that their
                               suspect findings of increased risk were related
                               to, and I quote, "very high levels of EO exposure
                               which existed over 40 years ago, before current
                               safety practices and exposure limits were
                               implemented."

00:39:51;03                    The other most informative EO worker study, and
                               one of the many I co-authored, includes men
                               producing and using ethylene oxide in Union
                               Carbide Corporation chemical plants from 1925,
                               the beginning-- the first to ever make ethylene
                               oxide. There's ample evidence of high exposures
                               in the early years of this industry.
                               Publications, spills, upsets in the early years,
                               the men were walking in liquid EO, burns right
                               through their shoes. It's all published.

00:40:25;15            A ten-year update has just been completed of this
                       cohort. It includes follow-up from 1940 to the
                       year 2013. That's 73 years of follow-up of 2,000
                       men producing and using ethylene oxide in
                       manufacturing. If there were a causal link to
                       cancer at these levels, it would have been
                       identified by now. The study with follow-up
                       through 2003 was available when EPA did their
                       risk assessment, and despite its availability,
                       they didn't use it in their modeling.


00:41:03;04            In addition to reliance on a single study, the
                       EPA risk assessment was derived from, as I had
                       mentioned earlier, the selection of a faulty
                       model for the relationship between ethylene oxide
                       exposure and risk. This is the most influential
                       decision made in the EPA analysis because it
                       modeled the NIOSH sterilin study data using a
                       relationship we call supralinearity, which means
                       assuming risk increases faster in the low-
                       exposure range than in the higher. This is not
                       what one expects with a carcinogen.

00:41:46;14                    This resulted in an exaggerated risk estimate at

                               low exposures. Supralinearity. It's contrary to

                               the discussion in the EPA document, itself, which

                               states, and I quote, "It is highly plausible that

                               the dose response relationship over the

                               endogenous range is sublinear, but supralinear."

                               Quite the opposite of the model selected. The

                               supralinear model is also contrary to the

                               expected mechanism of carcinogenicity, to what is

                               seen in the epidemiology studies, including the

                               NIOSH worker communication, which said high

                               exposures, and the mode of action of EO in the

                               human body.


00:42:31;11                    Had the EPA used a more traditional exposure

                               response model, which fits the data equally well,

                               the result would have been very different and

                               more plausible. The u-- U.S. EPA's cancer risk

                               assessment guidelines-- they have their own

                               guidelines-- caution that, and I quote here, "A

                               steep slope, that is supralinear, also indicates

that errors in an exposure assessment can lead to large errors in estimating risk."

00:43:02;00     This is relevant to their risk assessment because the NIOSH model, as I mentioned earlier, had some very serious uncertainties in the early years of the industry. The EPA document concludes that lifetime levels-- exposure levels as low as .1 part per trillion-- now unfortunately the previous testimony used nanograms-- per meter cubed and I'm using PPMs and PP-- so there's a translation of those-- those numbers.

00:43:36;23     We won't go into that now, but the EPA level, I think it's easier to understand at part per trillion, .1 part per trillion, they say, poses a cancer risk based on this document that I just described the flaws in. In addition to being contrary to the findings of the epidemiology studies, workers exposed to much higher levels-- this level is so small as to suggest human activities are a health concern (?).

00:44:05;03            For example, the levels of ethylene oxide in

                       ambient air, naturally produced by the human

                       body, and the levels exhaled in human breath are

                       hundreds, if not thousands of times greater than

                       the minute exposure level that EPA calculates as

                       posing a risk to humans. The EPA cancer risk

                       value is an implausible exaggeration and strains

                       scientific credibility.


00:44:30;23            It is therefore scientifically incorrect to draw

                       inferences about cancer risks to populations

                       potentially exposed to ethylene oxide using this

                       EPA cancer risk number, as has occurred in the

                       ATSDR report and the NATA 2014 assessment. Just

                       one final thing I want to say. I-- I've worked

                       with communities over my 40 years-- communities'

                       concerns, and mostly it's cancer. And cancer is--

                       a tragic disease, and I am very sympathetic

                       because people always want to know, "Why? Why did

                       I get this?"

00:45:09;20              And for some cancers, we know a great deal, such

                         as lung cancer, we know smoking attr-- con--

                         counts for over 90%, but there are many other

                         cancers that have risk factors, but very few--

                         not a great deal that we know all of them why,

                         why. There's a big gap-- for many of these

                         cancers. And-- it's sad and-- and I'm sorry for

                         the pain of this community, but I think there's

                         unwant-- unwarranted fear that it's ethylene

                         oxide. Thank you.

                                         SEN. DAVID KOEHLER, CHAIR:

00:45:42;09              All right. And you have about two minutes to

                         conclude this-- part of it.

                                         THOMAS TRIMBLE:

00:45:46;22              All right, no, that will work fine. Good morning-

                         - Chairman and members of the committee. My name

                         is Thomas Trimble. I'm with-- the Advanced

                         Medical Technology Association and with the

                         National Association of Medical Device

                         Manufacturers, so coming at this with a little

                         different perspective.

MEDIA ID: STERIGENICS-HEARING-3.MP4                                    PG. 49

00:45:59;18            But our members are very concerned about this

                      issue and the potential that this legislation

                      could ban ethylene oxide, which they rely on

                      very, very much. So-- (UNINTEL) we have about 400

                      members in our-- association and about 45 of them

                      have facilities in Illinois. And-- I think

                      roughly about 30 million products are sterilized

                      with-- ethylene oxide in Illinois on an annual

                      basis.


00:46:24;21           And-- I mean the medical products and pretty much

                      anything that's used to diagnose and treat a

                      healthcare condition that's not a drug. So, it's

                      really the wide range of-- bandages and sutures,

                      to-- implantable-- hip replacements, knees,

                      cardiac devices, imaging equipment. So, a very

                      wide range. Obviously all of those don't--

                      require ethylene oxide, but a lot do. Some that--

                      because they're-- the way they're manufactured to

                      be biocompatible with the body, have to have

                      certain characteristics.

00:46:56;00            And-- other-- sterilization processes don't
                       accommodate them as well, like some plastics
                       that-- with other processes that may have high
                       temperatures or moisture in them or radiation
                       that causes the-- the products to become brittle
                       when you want a flexible product. So, that's--
                       prohibitive to use other products-- other
                       processes than EtO. And those other factors as
                       well can-- cause damage to-- mechanical and
                       electronic-- components in devices.


00:47:22;25            So, again, that's why we-- we are not aware of
                       any other suitable alternative for ethylene
                       oxide-- for many, many of these devices. So,
                       just-- a little background that might be helpful
                       for-- medical devices now. The FDA as well-- the
                       federal FDA has a bit of a role in-- this. I
                       mean, FDA approves devices, but they also look
                       very thoroughly at every step of the
                       manufacturing process and even post-
                       manufacturing, when products are with patients,
                       and track-- make sure everything is done to be--

ensure the safety and effectiveness of devices.

00:47:55;07          And-- even the-- they look at the-- sterilization
                     process in terms of-- contracting out because
                     they see that as an-- extension of the
                     manufacturing process. And-- companies are
                     required-- I mean companies that-- follow--
                     established sterilization methods-- methods such
                     as EtO must comply with voluntary consensus
                     standards-- that are recognized by FDA as well as
                     global authorities that-- companies are-- are
                     (UNINTEL) international and-- have to follow all
                     these rules and regulations, and follow good
                     manufacturing processes as well.


00:48:28;13          So-- any change to-- the type of-- sterilization
                     process, if there was an-- even an alternative
                     available or the location of their sterilization
                     facility, would have to go back to the FDA in--
                     in terms of the validation of that process,
                     which-- would be a lengthy process, again-- even
                     if there was, but we're not aware of any-- other

                    alternative right now.

00:48:50;11          So, if there was any kind of ban or restriction of ethylene oxide, it would have-- a drastic and negative impact on patient access to technologies that they need. So-- so with that, I'll just conclude and be glad to work with the committee on-- trying to address this issue.

                    SEN. DAVID KOEHLER, CHAIR:

00:49:05;02          Thank you to the panel. Committee-- Senator Bush? Senator Biss? Senator McGuire?

                    SEN. MELINDA BUSH:

00:49:12;05          Thank you for your testimony. I'd like to ask-- Doctor-- is it Tata?

                    DR. JANE TATA:

00:49:16;24          Yes.

                    SEN. MELINDA BUSH:

00:49:17;26          Sorry. Can you tell me-- so, are you paid by Medline to be here today?

                    DR. JANE TATA:

00:49:22;27          I work for Exponent. Exponent will bill Medline and they'll pay Medline and I will bill Exponent

                              (LAUGH) for my time.

                                        SEN. MELINDA BUSH:

00:49:31;17          Okay. So, is it also then your testimony that the

                     maps-- on the EPA site that show-- both certainly

                     the areas surrounded-- Vanguard and Medline and

                     my communities-- and the map-- Millbrook (SIC)--

                     sorry, Willowbrook, that those maps are

                     incorrect?

                                        DR. JANE TATA:

00:49:52;03          Yes, it's-- it's incorrect because they're using

                     that EPA risk n-- number.

                                        SEN. MELINDA BUSH:

00:49:59;03          So, that's your opinion?

                                        DR. JANE TATA:

00:50:00;12          That's my opinion, absolutely.

                                        SEN. MELINDA BUSH:

00:50:01;25          Okay. I just wanted to clarify that. I also have

                     a couple of more questions. So, it is your

                     testimony there is not another material, another

                     gas, or another material that could be used to

                     sterilize equipment. Is that what your testimony

                     was? Yes, I'm sorry.

                              THOMAS TRIMBLE:

00:50:19;26          That's my understand.

00:50:23;13                    (OVERTALK)

                              SEN. MELINDA BUSH:

00:50:23;28          It's pretty important testimony. If you're

                     telling us there's nothing else that can be used

                     in place of this?

                              THOMAS TRIMBLE:

00:50:29;05          That's what-- again-- I'm not a scientific expert

                     on the sterilization processes. From what I

                     understand from our members, that is the-- the

                     case for these products. There are-- (UNINTEL)

                     there's other types of sterilization now, gamma

                     sterilization-- steam sterilization. The FDA--

                     some companies look at novel (?) sterilization

                     methods, but the FDA looks at those very closely

                     and has not approved that-- other-- new types for

                     many of these devices, so that the--

00:50:55;00                    (OVERTALK)

                              SEN. MELINDA BUSH:

00:50:55;04          And you think that by 2022, that it would be

                     possible that something else could be-- could be

approved?

THOMAS TRIMBLE:

00:51:01;04          Well, I mean, I-- I know a lot of times-- and--
                     and I don't know-- I'm not saying that's the case
                     here, but--

SEN. MELINDA BUSH:

00:51:05;26          Yeah.

THOMAS TRIMBLE:

00:51:06;14          --policymakers will say, "Let-- let's put a date
                     out far enough that something will come up. The
                     smart people will-- will figure something out."
                     And-- I don't know, you know, maybe that's the
                     case, but we-- we don't have any evidence right
                     now to-- to say that that's the case. There's
                     certainly nothing that's-- a suitable alternative
                     right now.

SEN. MELINDA BUSH:

00:51:20;24          Okay. And-- just a couple of more questions. So,
                     do any of you live by Sterigenics or Medline or
                     Vanguard? I just want to know if you live in
                     those areas. Would you-- I guess it's an opinion-
                     - you wouldn't consider maps, cancer-causing maps

MEDIA ID: STERIGENICS-HEARING-3.MP4                                    PG. 56

                         that the EPA has on-- online and obviously stands

                         behind when you consider where you live. You

                         wouldn't consider those things?

                                        DR. JANE TATA:

00:51:52;23              I'll be happy to answer. Consider--

                                 SEN. MELINDA BUSH:

00:51:54;14              I just wonder if any of you would. When you are

                         locating your family-- to live in a neighborhood-

                         - would you consider-- EPA maps that indicate

                         carcinogens-- unsafe levels of carcinogens? Would

                         you consider that when you are determining where

                         you're going to live with your family?

                                         DR. JANE TATA:

00:52:13;15              If they were legitimate maps-- and I felt

                         confident in the science, sure, I'd consider it.

                         And by the way, I spent 50 years in a blue collar

                         town near factories and I could smell the rubber.

                         I don't come from the suburbs.

                                   SEN. MELINDA BUSH:

00:52:34;25              Perhaps that's not a good thing. Anyway-- I

                         appreciate your testimony. There's obviously a

                         lot for us to learn here. Are there acceptable

levels? I mean, my understanding is, and this is
very cursory at this point, is that the-- the
problem really arises when it is breathed, as I
understand. That's the largest risk.

00:52:55;24       So, I'm wondering why there aren't ways that the
emissions-- could be-- scrubbed or-- there--
there aren't ways that we can really reduce them-
- to a place where they're almost negligible. I'm
certainly not looking to shut down manufacturing-
- but I really think there are some serious
questions that have to be answered here. Thanks.

                  SEN. DAVID KOEHLER, CHAIR:
00:53:16;28       Senator Biss?

                  SEN. DANIEL BISS:
00:53:22;13       Thank you, Mr. Chairman. So, Dr. Tata, you said a
lot of things and I want to just make sure we're
understanding-- what you were-- getting at. As--
as I understood your testimony, you were
basically saying, "Hey, look, there's this
scientific report that's been released and-- you
know, this is complicated stuff. We have to

assemble models, make a series of assumptions.

00:53:54;02          "We might have some guesses about what we're

gonna learn from that." Every single study that

would be done on this type of question has those

features. And it sounded like what you were

saying was you disagreed with some choices that

the scientists that conducted the study made

regarding what models they were utilizing and you

were pretty surprised, to the point of

disbelieving, about some of the conclusions that

you believe they drew. Is that a fair

characterization of your testimony?

DR. JANE TATA:

00:54:23;05          With the exception of the EPA work was not a

study. They did not collect any new information.

They took information from another study and they

manipulated it, and I disagreed with how they

manipulated it. But my opinion really comes from

the work I've conducted. I studied these ethylene

oxide workers over a s-- 73-year--

                              SEN. DANIEL BISS:

00:54:45;18          And-- I'm-- I'm interested in asking about--

                              DR. JANE TATA:

00:54:48;04          Okay.

                              SEN. DANIEL BISS:

00:54:49;06          --their work. And-- forgive me, I'm not an expert

                     in the field. I don't know-- I didn't realize the

                     word study is meant to be used only in that

                     context. What's the appropriate word to use for

                     what they did?

                              DR. JANE TATA:

00:54:58;14          Well, it's a risk assessment. And study--

                              SEN. DANIEL BISS:

00:54:59;10          Okay, so their assessment--

                              DR. JANE TATA:

00:55:00;01          --could be used generically, but I-- I'm trying

                     to make it-- yeah.

                              SEN. DANIEL BISS:

00:55:00;27          Let's just-- let's stick with-- I just don't

                     want-- I don't want to make any-- mistakes here.

                     Do the scientists, government agencies, other

                     workers that were involved in that assessment

                         agree with your characterization?

                                  DR. JANE TATA:

00:55:17;17          Other workers? Oh, you mean those--

00:55:20;05                  (OVERTALK)

                            SEN. DANIEL BISS:

00:55:20;24          Like-- like-- so, I guess what I'm saying is

                     there's a dispute here.

                                  DR. JANE TATA:

00:55:25;29          Yes.

                            SEN. DANIEL BISS:

00:55:27;04          Sometimes in science, the dispute might be, "Oh,

                     damn, those guys misread the thermometer," so

                     they published a number that was incorrect. Now,

                     we can all look back and say, "Yikes, that was

                     incorrect." Sometimes two sides would disagree

                     about methodology.

                                  DR. JANE TATA:

00:55:43;15          Uh-huh (AFFIRM). Okay.

                            SEN. DANIEL BISS:

00:55:45;17          Where are we here?

                                  DR. JANE TATA:

00:55:46;18          Okay. This is more than opinion. And we sub--

                              SEN. DANIEL BISS:

00:55:49;25          Ah-ha.

                              DR. JANE TATA:

00:55:50;19          --we submitted a very detailed-- request for

                     correction to-- under the Information Quality

                     Act, where we objected--

                              SEN. DANIEL BISS:

00:55:59;26          Who's-- who's we in that context?

                              DR. JANE TATA:

00:56:01;06          We-- well, like I said, I worked on it, but the

                     American Chemistry Council submitted it. And--

                              SEN. DANIEL BISS:

00:56:05;28          Uh-huh (AFFIRM).

                              DR. JANE TATA:

00:56:06;23          --we identified actual errors in the report,

                     factual errors. It wasn't just opinion.

                              SEN. DANIEL BISS:

00:56:14;18          And has the-- have the-- those who-- published

                     the report agreed with your assessment that there

                     were some errors?

                              DR. JANE TATA:

00:56:20;21          We haven't heard back yet.

                              SEN. DANIEL BISS:

00:56:21;19          Uh-huh (AFFIRM). Okay. So, we have what appears

                     to be a difference of opinion between two

                     different collections of experts.

                              DR. JANE TATA:

00:56:33;06          I guess you'd call it a difference of opinion

                     based-- hopefully based on fact. Not on--

00:56:37;07                   (OVERTALK)

                              SEN. DANIEL BISS:

00:56:37;19          Well, but-- but again--

                              DR. JANE TATA:

00:56:38;14          It wasn't interpretation. That's my point. This

                     was not-- we looked at a study and you

                     interpreted the findings a little differently

                     than I interpreted the findings. It isn't that.

                     It's-- it's the methodology incorrect and

                     identifying why it's incorrect.

                              SEN. DANIEL BISS:

00:56:54;14          So, you, in your capacity as a person-- making

                     filings with the American Chemistry Council and

                     employed by Exponent, have made an assertion

                     about a methodology that others, for example

MEDIA ID: STERIGENICS-HEARING-3.MP4                                    PG. 63

                              those who are not on industry payroll, have not

                              at this time agreed with.

                                        DR. JANE TATA:

00:57:14;14                   There-- I-- I assume the EPA disagrees-- the ones

                              who did this report, but I think there are other

                              scientists, maybe even within EPA-- they're not

                              comfortable because the end result is

                              implausible. It doesn't fit with reality.

                                        SEN. DANIEL BISS:

00:57:28;06                   Okay.

                                        DR. JANE TATA:

00:57:29;04                   So-- the-- you know, you won't to say because I--

                              I was hired by industry. I'm at the end of my

                              career. This isn't-- I didn't even want to get

                              involved 'cause I know this is gonna be a long,

                              drawn out affair. They begged me to get involved

                              because of my history and my knowledge of

                              ethylene oxide. I don't-- it's not about who paid

                              me. Believe me.

                                        SEN. DANIEL BISS:

00:57:52;11                   Well-- as you well know, that standard is not one

                              that most of academia agrees with.

MEDIA ID: STERIGENICS-HEARING-3.MP4                                    PG. 64

                              DR. JANE TATA:

00:57:59;14          What?

                              SEN. DANIEL BISS:

00:58:00;23          The standard of, "Hey, don't worry about who's

                     paying the researcher."

                              DR. JANE TATA:

00:58:04;28          Oh, I think--

                              SEN. DANIEL BISS:

00:58:05;06          That's not a standard that worked very well with

                     smoking studies. It's not a standard that works

                     very well even in economic studies today. That's

                     not a good standard for scholarship. Now, let me

                     ask you on this question, you work for Exponent?

                     Is that-- that's-- you-- they're your full-time

                     employer?

                              DR. JANE TATA:

00:58:20;14          Yes. I'm-- I'm now an hourly employee.

                              SEN. DANIEL BISS:

00:58:22;13          Oh (UNINTEL). What-- what is Exponent?

                              DR. JANE TATA:

00:58:24;15          Exponent is a scientific and engineering

                     consulting company.

                              SEN. DANIEL BISS:

00:58:27;18          And who are their clients?

                              DR. JANE TATA:

00:58:29;10          Everything. Government, industry-- any complex

                     problems. They do accident investigations. Anyone

                     who comes for help with complex problems of--

                     scientific or engineering.

                              SEN. DANIEL BISS:

00:58:43;17          Got it. Were they, or you personally, or other

                     groups that you're involved with-- in some

                     contractual basis a part of an effort to persuade

                     the government not to release the risk

                     assessment?

                              DR. JANE TATA:

00:58:55;12          No, I wasn't.

                              SEN. DANIEL BISS:

00:58:57;13          Okay. Good to know. Well, thank you. I-- I just

                     think that this is a really, really important

                     distinction that we've just talked about. There

                     is a dispute, different people have different

                     positions. That's healthy. That's how scholarship

                     works.

MEDIA ID: STERIGENICS-HEARING-3.MP4                                    PG. 66

00:59:15;29              In this instance, the people of one position are

                        on payroll. That-- I'm not saying you're a bad

                        person. I'm not saying you're a dishonest person.

                        I'm saying you are not neutral and your

                        credibility is therefore not the same as those

                        who advance the other side. Not because of who

                        you are, but because of the way in which

                        centuries now of evidence demonstrate what

                        happens when one side in a scientific dispute is

                        on the payroll of somebody who has a financial

                        interest in the outcome. That's just how these

                        things have worked forever. Thank you very much.

                                SEN. DAVID KOEHLER, CHAIR:

00:59:54;20             Senator McGuire?

                                SEN. DANIEL BISS:

00:59:56;24             Thank you, Mr. Chair. Dr. Tata, I appreciate your

                        lifelong interest in worker health and safety.

                                DR. JANE TATA:

01:00:02;12             Thank you.

                                SEN. DANIEL BISS:

01:00:03;13             And following the questioning of-- he's not

Senator Solokof (PH) or Senator Sam Epstein (PH).
He's Senator Daniel Biss, (LAUGH) right. I think
we know-- or knew some of the same people. So,
who classifies-- ethylene oxide as a carcinogen?

                    DR. JANE TATA:

01:00:23;20        That's a good question. It's done by numerous
                   health agencies, okay. And they all have their
                   criteria for classification. So, one of the most
                   important is the International Agency for
                   Research on Cancer, IARC, in Europe-- France. And
                   then there's the National Toxicology Program and
                   then there's the U.S. EPA.


01:00:48;24        And they do these-- these independently and they
                   classify. At one time, the criteria of all
                   agencies was sufficient human data to classify as
                   a known h-- human carcinogen. About ten years
                   ago, IARC changed their criteria because everyone
                   agrees with ethylene oxide. EPA, me, all the
                   scientists agree that the human data is not
                   sufficient. The 13 studies is not sufficient to
                   class-- to say ethylene oxide is a carcinogen.

It's all agreed. It's in the document.

01:01:25;07          I didn't give that quote, but it's in the
                     document. But they said, "What we're going to do
                     is even if the human data's limited, we're going
                     to look at animal data, we're gonna look at
                     mechanistic data. And if we think there's
                     corroborative support from those other avenues,
                     we're s-- we're gonna raise it to the level of
                     known human carcinogen."

01:01:45;26          And that is what happened at IARC. And I was an
                     invited participant there. The epidemiologists
                     came out and said it's not sufficient. And the
                     others said, well, animal and all this, and it
                     got raised. EPA just, in this document, also took
                     on that same criteria and called it human. They
                     say right in the document it's not sufficient,
                     human.

                                    SEN. DANIEL BISS:

01:02:08;17          Is ethylene oxide classified as a carcinogen by
                     the U.S. EPA?

                            DR. JANE TATA:

01:02:12;10              It is.

                            SEN. DANIEL BISS:

01:02:13;24              Is ethylene oxide classified as a carcinogen by

              the Federal Occupational Safety and Health

              Administration?

                            DR. JANE TATA:

01:02:21;17              OSHA?

                            SEN. DANIEL BISS:

01:02:21;27              Yes.

                            DR. JANE TATA:

01:02:23;01              I haven't seen the la-- OSHA hasn't had anything

              in a very long time, so I haven't look at OSHA's-

              -

                          SEN. DANIEL BISS:

01:02:28;16              Is ethylene oxide--

                          DR. JANE TATA:

01:02:29;07              --classification.

                          SEN. DANIEL BISS:

01:02:29;18              --classified as a carcinogen by NIOSH?

                          DR. JANE TATA:

01:02:33;14              I haven't looked at their document lately either.

Probably, but-- I haven't looked at it.

SEN. DANIEL BISS:

01:02:37;11          But, Doctor, you--

DR. JANE TATA:

01:02:38;14          I don't know that they have-- I don't know that

NIOSH does the same thing. They're the arm of

OSHA. They're the research arm of OSHA. So--

SEN. DANIEL BISS:

01:02:44;25          Well, of CDC, right. But-- but Doctor, you've

disputed NIOSH's methodology, if I understood

your-- your testimony. You've disputed NIOSH's

methodology in recommending a lower exposure

limit, yet you don't know if NIOSH classifies

ethylene oxide as a carcinogen?

DR. JANE TATA:

01:03:06;16          I was talking about the NIOSH conducted research

of EO, the sterilin plant worker study, not how

they classified. That study was an independent

published epidemiology study that was used by

EPA. And I criticized how EPA used that study.

SEN. DANIEL BISS:

01:03:25;19          Okay. So, the-- the-- federal EPA classifies

                                  ethylene oxide as a car-- carcinogen.

                                            DR. JANE TATA:

01:03:31;03              Excuse me? Who did? The EPA did?

                                        SEN. DANIEL BISS:

01:03:33;23              EPA did.

                                            DR. JANE TATA:

01:03:34;02              Yes, they classified it.

                                        SEN. DANIEL BISS:

01:03:34;19              Okay. And you mentioned that in the '20s, at a

                                    Union Carbide plant, that workers were wallowing

                                    in ethylene oxide.

                                          DR. JANE TATA:

01:03:39;13              Well, in the early years of the industry, yes.

                                        SEN. DANIEL BISS:

01:03:41;08              Pardon me?

                                          DR. JANE TATA:

01:03:41;19               By nine-- in the early years--

                                        SEN. DANIEL BISS:

01:03:43;02              Okay, right.

                                        DR. JANE TATA:

01:03:43;16               --of the industry.

                              SEN. DANIEL BISS:

01:03:44;16          Right. Okay. Has the worker exposure limit been

                     lowered over time?

                              DR. JANE TATA:

01:03:50;23          Certainly. Around 1978 and with c-- OSHA, the

                     levels dropped.

                              SEN. DANIEL BISS:

01:03:55;08          Okay. Okay. And what has the rationale been for

                     lower-- for setting an exposure limit to ethylene

                     oxide and then reducing it?

                              DR. JANE TATA:

01:04:02;27          Why did OSHA do it? Oh, the-- I would say, in the

                     '70s-- in 1979, Union Carbide conducted-- a rat

                     study and it showed that at 100 parts per

                     million, the rats had an increased risk of

                     cancer. And that started, you know, the concern

                     and everybody dropped. OSHA came on and, you

                     know, and took it on from there. And then the epi

                     studies began-- epidemiology studies began to be

                     conducted around 1979.

                              SEN. DANIEL BISS:

01:04:29;23          Okay. And-- so there is a credible animal study--

                                  proving that ethylene oxide causes cancer?

                                             DR. JANE TATA:

01:04:43;04                It is an animal carcinogen.

                                         SEN. DANIEL BISS:

01:04:44;09                Okay.

                                             DR. JANE TATA:

01:04:44;21                And I'm not here saying it definitely is not a

carcinogen. I'm saying the evidence is limited.

It's not a known human carcinogen, in my view.

But I can't rule out-- you cannot prove a

negative. I'm saying the limited-- the evidence

is limited. It's not a potent carcinogen; I'm

absolutely certain of that because I'd be seeing

a lot more in these workers.

                                         SEN. DANIEL BISS:

01:05:08;21                And could you give us-- examples of potent

carcinogens?

                                           DR. JANE TATA:

01:05:14;18                Vinyl chloride, liver.

                                         SEN. DANIEL BISS:

01:05:17;23                Okay.

DR. JANE TATA:

01:05:19;14          Benzene (UNINTEL) leukemia.

SEN. DANIEL BISS:

01:05:21;26          All right. Okay. And if I understood you

correctly, Doctor, you-- stated that-- well, tell

me, you mentioned one part per trillion-- per

trillion.

DR. JANE TATA:

01:05:33;20          Point-one. Point-one.

SEN. DANIEL BISS:

01:05:34;29          Point-one, okay, 1/10 of one, okay. Did I hear

you say that, as I speak to you, I could be

emitting .1 part per trillion of ethylene oxide?

DR. JANE TATA:

01:05:46;18          You're emitting hundreds of times more than that,

.05 to one part per billion comes out of mouths.

Our body-- inside our body is 1.8 part per

billion, thousands times higher than the EPA risk

number.

SEN. DANIEL BISS:

01:06:01;16          Okay. And-- and tell us the relevance of that to

workplace exposure and community exposure.

MEDIA ID: STERIGENICS-HEARING-3.MP4                                    PG. 75

DR. JANE TATA:

01:06:08;25          Well, what I'm saying is the level at which EPA--

declares there's a risk to-- humans is many times

lower than what is all around us, what we produce

in our body. And it's un-- it doesn't pass the

reality check. And-- and when you do m--

monitoring, this measurement is so complicated

around communities because you're getting EO from

cars, you're getting EO from smokers, and you're

getting EO from the ambient air. And then you--

you're trying to say, well, how much of that is

coming from the plant? That's why they do

modeling instead of monitoring many times. The

ATSDR did-- put canisters around.

SEN. DANIEL BISS:

01:06:56;08          And what is ATSDR, Doctor?

DR. JANE TATA:

01:06:57;17          That's the one that did the report--

01:06:59;19                    (OVERTALK)

SEN. DANIEL BISS:

01:06:59;29          Okay. And-- and-- and about the different sources

of human exposure to ethylene oxide, okay, maybe

my Buick Verano emits some, maybe my corpus emits

some, but-- the source concentration would not

equal that of a manufacturing plant or a

sterilizer.

                         DR. JANE TATA:

01:07:27;07        You're absolutely right.

                         SEN. DANIEL BISS:

01:07:28;12        Right? Worker exposure is eight hours a day, 40

hours a week, additional exposure if there's any

overtime work.

                         DR. JANE TATA:

01:07:34;24        And that's why--

                         SEN. DANIEL BISS:

01:07:35;03        There are time-weighted averages, the average

exposure--

                         DR. JANE TATA:

01:07:37;19        Uh-huh (AFFIRM).

                         SEN. DANIEL BISS:

01:07:39;09        --over a work day. There are peak concentrations.

                         DR. JANE TATA:

01:07:41;26        Absolutely. And that's why you have to do studies

of those workers to see--

                              SEN. DANIEL BISS:

01:07:44;01          Right, which could exist in a community which

                     surrounds a facility which is having egregious

                     emissions of ethylene oxide.

                              DR. JANE TATA:

01:07:51;22          Well, I-- I'm not aware-- I'm not knowledgeable

                     about the emissions from the plant, myself.

                     That's not what I'm here to talk about. I could

                     just tell you what our worker study shows, with

                     high exposures, and then you have to have lower

                     exposures to the community because they're a more

                     vulnerable population. And it's my understanding,

                     and someone else would have to prove it, that

                     their levels are lower than the workplace.

                              SEN. DANIEL BISS:

01:08:18;24          Wait, say that again. Someone would have to prove

                     that--

                              DR. JANE TATA:

01:08:20;20          Well, someone-- you know--

                              SEN. DANIEL BISS:

01:08:21;27          That the kid waiting for the school bus, that his

                     exposure is--

DR. JANE TATA:

01:08:26;07         Less than what--

SEN. DANIEL BISS:

01:08:26;15         --less than-- than his mother who works in the

plant?

DR. JANE TATA:

01:08:29;27         One PPM is considered reasonable for workers.

Whatever the community's exposed to must be,

should be lower than that, but we have trouble

monitoring, but I have to think that what comes

out of the stack, if it's only 1% emission, that

the community would have a much lower, by the

time it gets out and gets dispersed to the

nearest neighbor, it's less than what workers

get. And the studies suggest workers are not

getting high rates of cancer from high levels of-

- of EO over many years.

SEN. DANIEL BISS:

01:09:08;04         Of course, perhaps the reason a study might not

show excess incidence among workers is because

that plant is controlling worker exposure to this

carcinogen.

DR. JANE TATA:

01:09:19;08          Not in 1940, '50, '60. That's when the majority

                     of the exposure in these workers started. I

                     started collecting the workers in 1940. We

                     stopped even looking after '78, including NIOSH.

                     They said, "Look, the lower-- the levels are so

                     low after '79-- or '78, don't even bother adding

                     new workers onto the cohort." So, our studies

                     cover a heavy exposure period.

SEN. DANIEL BISS:

01:09:46;10          One final question-- I think one final. So-- a

                     previous witness-- stated that NIOSH's

                     recommended exposure limit is 100-- 180 nanograms

                     per cubic meter. Do you know when that

                     recommendation was made?

DR. JANE TATA:

01:10:05;12          I think it's old, but I don't know.

SEN. DANIEL BISS:

01:10:07;07          Do you know-- but in what decade? You-- you-- I

                     think I just heard you say that studies of

                     worker-- mortality due to exposure to ethylene

                     oxide ended in 1978? Did you say that?

                              DR. JANE TATA:

01:10:20;21          Began. Began. The-- the studies appeared in the

                     literature starting in '79.

                              SEN. DANIEL BISS:

01:10:26;13          Okay.

                              DR. JANE TATA:

01:10:27;15          But some of them, like ours, went back in time,

                     retrospectively--

                              SEN. DANIEL BISS:

01:10:30;14          Right.

                              DR. JANE TATA:

01:10:31;02          --to study workers, yes.

                              SEN. DANIEL BISS:

01:10:31;21          Okay. All right. But it-- it appears that there

                     was continued scientific assessment of-- the risk

                     to human life posed by ethylene oxide.

                              DR. JANE TATA:

01:10:42;07          I'd have to--

                              SEN. DANIEL BISS:

01:10:42;16          That the-- that the-- that the-- that the jury--

                     the scientific jury has not returned its verdict.

                                    DR. JANE TATA:

01:10:49;01          My opinion, there will not be-- anymore. Our

                     study s-- is 73 years of follow-up. I'm not gonna

                     study them anymore. They're all-- 70% of them

                     have died by now. They're old.

                                    SEN. DANIEL BISS:

01:11:02;03          Right.

                                    DR. JANE TATA:

01:11:03;14          NIOSH-- I don't think-- they can't even find the

                     data that they used for part of this, so I don't

                     see them updating their study. So, where is it

                     gonna come from?

                                    SEN. DANIEL BISS:

01:11:15;09          But--

                                    DR. JANE TATA:

01:11:16;07          I don't think you'll see any more.

                                    SEN. DANIEL BISS:

01:11:16;24          Respectfully, if I understand you, you're talking

                     about one cohort that worked for one corporation

                     early in the 20th century. We're talking about

                     current exposure, current day-to-day exposure--

DR. JANE TATA:

01:11:31;06          Uh-huh (AFFIRM).

SEN. DANIEL BISS:

01:11:32;17          --to workers and community residents. And it

                     appears, based on what we've heard today from

                     both panels, that-- scientific assessment of the

                     risk posed by ethylene oxide continues, that a

                     definitive answer has not been reached, that the

                     case is still open. Thank you.

SEN. DAVID KOEHLER, CHAIR:

01:11:56;01          Senator Morrison, and then we'll follow-up

                     question from Senator Bush.

SEN. JULIE MORRISON:

01:12:01;10          Thank you, Mr. Chairman. I represent-- a

                     significant part of Lake County as well, and this

                     is obviously on my radar. Today I have just two

                     quick questions. The first-- in terms of the

                     sterilization process, I thought I heard from

                     other-- other people providing testimony that St.

                     Anthony's and Swedish Covenant no longer use

                     this-- the same process that is in question, that

                     there is a different sterilization method. So, am

MEDIA ID: STERIGENICS-HEARING-3.MP4                    PG. 83

I-- can you-- can you help me re-- justify what

your response was on that in terms of medical

equipment? Yes, you. Sorry.

                    THOMAS TRIMBLE:

01:12:41;07    That's all right. I-- well, I-- I think I'd have

to, if I could, look into that and get back to

you because I really can't speak to what the

hospitals are doing on it. Yeah, I-- I-- I think

they're-- they may-- it may be that there are

different devices that-- some-- some of the ones

I mentioned are-- are one-time use and some of

those surgical kits come through, the kits will

have everything together for all different types

of surgery. There's an example here I think, that

all are packaged together, that's sterilized with

ethylene oxide. And-- so, again, after the

surgery, that-- that's not gonna be reused. So--

                    SEN. JULIE MORRISON:

01:13:12;15    But there are other FDA-approved methods that

are-- it sounds like are being used in Illinois.

                    THOMAS TRIMBLE:

01:13:18;03    In-- in the hospitals?

                         SEN. JULIE MORRISON:

01:13:19;27              Uh-huh (AFFIRM).

                         THOMAS TRIMBLE:

01:13:21;14              Again, I can't speak to what the hospitals are

                         doing. I could-- I could see if I can find more

                         data to-- or information about why there's a

                         difference between hospital and manufacturing--

                         and the manufacturing products, but I-- I don't--

                         SEN. JULIE MORRISON:

01:13:34;04              My second-- my last question is obvi-- (NOISE)

                         obviously this happens all over-- I'm so sorry.

                         Just like home. My other question-- revolve-- I

                         always ask about other states. What other states

                         have come forward with similar problems, similar

                         questions, similar occurrences of disease and--

                         and confronted-- and confronted you guys with the

                         same concerns?

                         THOMAS TRIMBLE:

01:14:10;09              So, I-- I can't address that. I've heard some

                         anecdotal information. I think the-- EPA director

                         may be able to talk a little bit about-- some

                         other states have been doing on this, but-- I-- I

don't--

01:14:18;22                          (OVERTALK)

                                SEN. JULIE MORRISON:

01:14:19;09        But he's-- he's only Illinois. I'm asking what

                   other states-- this seems especially a doctor who

                   is, you know-- nationally known person who's, you

                   know, has some expertise in this with a long

                   career. I'm wondering if any other states have--

                   that you've had to-- come in and do similar

                   testimony.

                                DR. JANE TATA:

01:14:44;29        I have routinely-- I worked for Union Carbide for

                   18 years and I routinely went to speak to

                   communities around chemical plants and show them

                   the epidemiology studies that we were doing. They

                   didn't raise a particular concern, but I would

                   routinely tell them, "We've done this study and

                   here are the results." They were interested in

                   their cancer rates. Living around chemical

                   plants, they were.

                                SEN. JULIE MORRISON:

01:15:11;17        With this particular ethylox (SIC)--

DR. JANE TATA:

01:15:15;19          Ethylene oxide.

SEN. JULIE MORRISON:

01:15:16;02          Yes. With this particular element?

DR. JANE TATA:

01:15:19;27          I don't recall, other than there was an explosion

                     at one of the chemical plants years ago. And

                     then-- there were concerns, well, there weren't

                     short-term effects, what about long-term effects?

                     And I do believe I went down and spoke to the

                     community about that.

SEN. JULIE MORRISON:

01:15:39;14          Okay. Okay, thank you very much. Senator Curran,

                     I'm gonna be signing on as a sponsor today with

                     your permission.

SEN. DAVID KOEHLER, CHAIR:

01:15:48;18          Senator Bush?

SEN. MELINDA BUSH:

01:15:52;15          Just a follow-up question. My understanding is

                     that Sterigenics-- installed something called

                     backventing. Is that something that we are seeing

                     required in other states-- because my

understanding is that is something that's being

looked at in other states and is being required--

for plants that are using ethylene oxide.

                BRAD BABCOOK:

01:16:15;08       Senator, from what I know-- and this would

probably be a better question for Director

Messina. They're the ones that approved-- the

construction permits for that. So from-- but my

understanding is, yeah, that is-- that is

correct. There's been-- other type controls--

being put on that which has actually reduced it.

And from what I know, I think it's a scrubber of-

- some sort (UNINTEL).

                SEN. MELINDA BUSH:

01:16:35;17       Thank you.

                SEN. DAVID KOEHLER, CHAIR:

01:16:38;23       Yes, any other questions from the committee? We

took a little longer time there, but I thought it

was important to get the-- questions answered--

from the committee. So, thank you, panel.

Director Messina? And I just talked to Mark. I

think one of the questions that we should-- do

some research on is what other states are doing
to address this issue. That's a good question.
Director, thank you.

                    ALEC MESSINA (IEPA):

01:17:03;14     Thank you. I appreciate it, Chairman, and members
of the committee. Happy to answer any questions
that you have-- and there were a number that were
raised-- during the previous panels that I'd like
to maybe expand on a little bit. I think, you
know, Senator Bush, you said something that--
that I repeat over and over again-- thank you,
sorry.


01:17:23;03     There-- there is a lot that we are still
learning. And-- and this has been a challenge
for-- for really-- not just U.S. EPA-- Illinois
EPA, we're all kind of grappling with a lot of
these issues. I am happy to talk about what other
states are doing as well. But anyway, with that,
I-- I-- you know, I-- I know I've-- I'll try and
stay true to the ten-minute panel commitment that
you had--

                              SEN. DAVID KOEHLER, CHAIR:

01:17:45;27        That we've already violated.

                              ALEC MESSINA (IEPA):

01:17:47;17        Yeah, I'll-- I'll do my best to stick with that.

                   First of all, you know, I-- I want to be clear--

                   because I do-- I do get a lot of emails and phone

                   calls from folks-- in the s-- in the Willowbrook

                   area and-- and the surrounding communities. And I

                   want to make it clear that, you know, we-- we

                   understand how critically important this issue is

                   and we have every intention of working with--

                   Senator Curran and the other House sponsors and

                   other stakeholders to come up with something

                   that-- that does have a positive impact and can

                   be implemented.


01:18:16;16        We do have some concerns with the language that's

                   out there from an implementation aspect. But--

                   certainly we want to work-- cooperatively and

                   collaboratively to get something that-- that we

                   can implement. With that-- I'll-- I'll really

                   just-- maybe provide a brief update on kind of

where we are at with a couple of different things
that have gotten some attention and then-- and
then really just-- raise some-- some general
thoughts that we have about the-- the language
that's out there now and then certainly answer
any questions that you have.

01:18:47;11          So, first of all-- I-- many of you may know, but
on the off chance that you-- that you haven't yet
heard-- you know, we-- we have referred a matter
over to the Illinois attorney general's office
relative to Sterigenics. We've been working with
them, hand in hand with the attorney general's
office, that is hand in hand-- both before that
referral went over on October 1st or 2nd-- and--
and certainly have been-- meeting with them
regularly, not just to take a look at this single
facility, but at other facilities as well.

01:19:15;01          Ad I think that was another one of the questions
that you asked of the last panel, so I can expand
on that. Item two-- so Sterigenics did install

venting. We issued a permit in June of this year
that authorized the-- installation and
construction of vents-- venting from their back
vents, which were at the time uncontrolled.

01:19:42;23          And that venting would then route to the stack
where a scrubber exists. So-- the-- as a part of
that construction permit that we issued in June,
and I believe that became fully operational on
July 27th of this year-- the construction permit
also required stack testing to occur. That
occurred to September 20th and 21st.

01:20:06;10          We received an initial report from-- the vendor--
that-- that conducted the stack test. We were
actually present during the test. U.S. EPA was
present, and a representative of the village of
Willowbrook was present. We raised some issues
with the initial report. They've updated that.
And we intend to post the revised report on our
website. If it didn't happen yesterday, it should
happen today. But the-- we have completed our

review of that report and should be able to speak

knowledgeably about that very shortly.


01:20:37;03          But-- certainly the initial indications are very

positive in terms of an emission reduction

impact. And then finally, the third point I will

note-- is, I think Senator Curran noted, that we

announced last week-- a joint effort with the

DuPage County Department of Public Health to test

private wells in the-- in the surrounding area--

surrounding-- in the area surrounding the

Sterigenics facility.


01:21:03;21          The county health department is engaged in a

canvassing effort that I believe began on

Tuesday. They intend to use-- a website, various

forms of electronic communication and following

that up with door to door-- door-knocking-- for

two purposes. One is to really ground truth the

maps that we have currently to-- to ensure that

we know where all of the private wells are that

are used for drinking purposes, as opposed to

MEDIA ID: STERIGENICS-HEARING-3.MP4                                      PG. 93

                irrigation. That's our primary focus obviously.

01:21:33;03           And then once we ground truth those maps, to

                      obtain access agreements so that our agency

                      staff-- can then-- enter onto the properties,

                      take the samples. We've-- contracted out with a--

                      private-- third-party laboratory to analyze those

                      samples. And then it's actually the Illinois

                      Department of Public Health that provides notice

                      certainly to the homeowners first, and then we

                      will-- once we make those notifications to

                      homeowners, we'll be able to speak generally

                      about what-- what those results showed.

01:22:04;05           And then, of course, potentially at least,

                      depending upon what those results show, we will

                      expand-- we're-- we're focusing on-- at minimum,

                      the half-mile radius with-- surrounding

                      Sterigenics. We believe that we'll be able to do

                      at least a mile. And then, again, depending upon

                      what those initial results show, we'll be able to

                      expand-- from there.

01:22:24;12            So-- again, I-- just-- a couple of things I
                       wanted to focus on with regards to any future
                       legislative efforts, things that are in our-- the
                       agency's mind as we move forward. And I'll just
                       focus on three. So, first-- the various proposal
                       have-- have suggested, or would require Illinois
                       EPA to promulgate or propose rules that would
                       create a s-- a-- what I'll refer to as a unique
                       emissions standard for either ethylene oxide or
                       sterilizing facilities that utilize ethylene
                       oxide.

01:22:58;14            And-- and I just-- a couple of things. One,
                       Illinois-- and specifically the agency, has never
                       adopted an-- our-- our own emissions standard for
                       a hazardous air pollutant. What we do do is we
                       really on U.S. EPA, that adopts these NESHAPs,
                       and we incorporate them by reference. Now I'm
                       gonna-- a quick tangent here because I know,
                       Senator Bush, you-- you reference-- and I think
                       also Senator Morrison, you asked questions about

what other states are doing, and I do want to
talk about that really quickly before I hit these
other two items.


01:23:32;26          The majority of states that we-- we see have--
                     have done as Illinois has done, and that is
                     adopt-- incorporate by reference that NESHAP.
                     Minnesota, Texas, Michigan, North Dakota, South
                     Dakota-- Indiana incorporate-- by reference that
                     NESHAP. Now, there are a handful of states that
                     use that as a starting point and then move
                     beyond. And I think that's kind of-- that's what
                     we're really-- I think that's what-- one of the
                     things that we want to do on a case-by-case
                     basis.


01:23:59;04          And what I-- what I mean by moving beyond is the
                     NESHAP does not require control of those back
                     vent or exhaust emissions. And so, I-- and so--
                     let's see, North Carolina, Washington,
                     California-- (MAKES NOISE) I'm sorry, my notes
                     aren't the most organized. I think there are a

MEDIA ID: STERIGENICS-HEARING-3.MP4                    PG. 96

                    couple of other states as well that-- that take

                    that approach.


01:24:23;15         So, they're not setting a unique emissions

                    standard. It's-- it-- but think of it as a, you

                    know, for those of you are familiar with the work

                    that we do, kind of a best available control

                    technology approach. And so, that's-- that's--

                    certainly I-- you know, I think that would be--

                    would have been required of Sterigenics if we go

                    down this path where we're requiring something

                    different than just that NESHAP, where they're

                    controlling those back vents.


01:24:48;17         We are in-- (CLEARS THROAT) excuse me. We've had

                    conversations with other facilities-- in the-- in

                    the area as well, those facilities that have been

                    identified by that-- by that national air toxics

                    assessment. And-- and we're looking at similar

                    approaches with those facilities as well. And I

                    would expect them to be coming in surely (?) to--

                    to the extent that they can get ahead of the

scrutiny that they're seeing elsewhere.

01:25:17;11        States, including Illinois, do not have the

resources or experience to develop and promulgate

emissions standards for (UNINTEL). That's why we

rely on U.S. EPA. Such resources include the

ability to analyze and make risk assessments.

Further regulations that would address

sterilization techniques are not found in state

law, but are regulated by the FDA. And-- there's

also been some discussion about OSHA as well.

01:25:38;09        And I would just be loath to put the Illinois

EPA-- who does not-- who-- who, by and large, do

not have those same-- that same level of

technical-- those technical resources, I would be

loath to put the Illinois EPA in the shoes of the

FDA or OSHA, who have experience and expertise in

these areas. Item two, there's been some

discussion about alternatives, and I'll expand on

that in a moment, but I just would first note

that-- the various proposals would-- would

MEDIA ID: STERIGENICS-HEARING-3.MP4                                    PG. 98

require Illinois EPA to make decisions on subject
matter that is outside of-- of-- of our expect--
expertise.

01:26:16;04          There's a discussion of whether there are
substitute steri-- sterilization technologies
available. There have been discussions about--
worker safety. Certainly the-- after the first
Willowbrook forum-- that attended, and other U.S.
EPA, ATSDR-- the very first phone call I made was
to the Illinois Hospital Association and said,
"Listen, this is something-- these alternatives
are going to be critically important. We're gonna
have to answer these questions and we need your
help to be able to answer those questions."

01:26:45;23          So, we have had conversations about-- gamma
radiation, steam, hydrogen peroxide. I'm not an
expert in this area-- but I will tell you
anecdotally (LAUGH) what I've heard is that--
ethylene oxide is-- is the-- is the sterilizer of
choice because gamma radiation-- has too harsh of

an effect and-- and oftentimes can destroy the--
well, destroy is probably a strong word, but--
but destroy that material that they're-- that
they're sterilizing.

01:27:17;16          Hydrogen peroxide does not have the same
penetration. There's also been a discussion about
hospitals-- getting out of the business of using
ethylene oxide-- as a sterilizing agent. And--
and I think that there have been some
discussions. And we've been working with the
Hospital Association and reaching out to
hospitals that currently are permitted to use
ethylene oxide.

01:27:37;26          And what we have been told-- and again, this
anecdotal information, but it-- it kind of points
to the fact that there's so much work that needs
to be done as expeditiously-- expeditiously as
possible. And that is many hospitals are
contemplating no longer using ethylene oxide, but
the vast majority of medical equipment that they

MEDIA ID: STERIGENICS-HEARING-3.MP4                                    PG. 100

have comes from commercial sterilizers that are
using ethylene oxide.

01:28:01;28          So-- there are alternatives. Are all of those
alternatives available and acceptable for use on
all equipment? I don't know. But certainly the
FDA is-- is telling manufacturers that that's
what-- that's what they must use. So, and you
know, I-- I think that there's a lot of work to
be done in this area of alternatives, but--
that's-- that's, again, that's not something that
the agency is capable of.

01:28:25;16          I said I was gonna be less than ten minutes, and
I'm not. So-- (LAUGH) the last point I'll just
note, and-- and that is-- you know, there is-- I-
- I do have a concern that-- that we-- as we move
forward in this-- important area, that we ensure
that there is at least some semblance of due
process.

01:28:42;07          Various proposals have talked about permit

MEDIA ID: STERIGENICS-HEARING-3.MP4                          PG. 101

revocation-- and-- and I don't believe it's
Senator Curran's, but as we're talking about all
these different things and different approaches--
one-- one piece of legislation that I reviewed--
referenced that-- and the quote is, "The revoking
of permits that the agency believes are
significantly endangering the public health are
not subject to existing Pollution Control Board
review procedures." And I just think that's
something we need to be mindful of as we move
forward. So, those are the-- the three items that
I wanted to address and I'm happy to try and
answer any questions you have.

        SEN. DAVID KOEHLER, CHAIR:

01:29:11;25          Yeah, I-- I-- I have a question-- and then we'll
open it up to the committee. So, basically the
panelists that-- represented the industry-- I
heard two things there. One was about-- that
there were no alternatives available. And I
didn't know whether that was-- in terms of the--
practical, you know, matter of sterilizing or
whether it was just a preference that-- that--

that-- people didn't-- didn't prefer to use
anything else.

01:29:41;29        So-- you've-- you've-- addressed that a little
                   bit, but I think that-- the committee-- if I can
                   speak on behalf of the committee, would like to--
                   be kept abreast of all-- any-- any discussions
                   and any-- insights that come about-- whether
                   there are viable alternatives-- that exist-- an--
                   anywhere in this nation-- because I think that's
                   an important factor.

01:30:02;28        The-- the other part of the testimony that--
                   that-- kind of confounds me-- is that-- the U.S.
                   EPA numbers are just not believed. Now, as
                   citizens, we kind of depend upon our government
                   agencies to give us good information, which we
                   expect to be objective and to be accurate. So,
                   what are we supposed to believe?

                                ALEC MESSINA (IEPA):

01:30:33;05        That's a phenomenal question and it's one that--
                   Mayor Trilla and Senator Curran and Leader

Durkin, and myself, and countless other people
have grappled with because-- I-- I don't think
that-- the information that was made available
publicly was really presented with sufficient
context.

01:30:53;21          It's certainly been clear, and I-- you know, I--
I'm-- I-- I think there's a lot more work that
needs to be done, but I think that there were
certain assumptions that were made in some of
these-- studies. You know, we-- there was a
discussion yesterday about the ambient air
monitoring that U.S. EPA conducted in May of this
year.

01:31:11;03          And there were-- there were some data points that
were excluded because they were attempting to
come up with the most conservative way of looking
at this as possible to determine if they were
even gonna do further research and review. And
that context was-- was missing as they conveyed
that information to the public-- not just the

public, but to the Illinois EPA and the-- the

Illinois Department of Public Health, and so

forth.


01:31:33;15            So, it has been frustrating. Senator Biss noted,

and I-- I-- (LAUGH) I-- I was nodding as you were

asking questions because-- you know, there--

there is some question as to e-- even whether

there is complete agreement within U.S. EPA,

frankly, as-- as-- what those studies show,

whether the studies were designed in such a

fashion to have something that was valuable and

worthwhile and could be conveyed.


01:32:07;09            And-- and-- and my frustration is, you know,

being-- you know, we rely on them, too. We rely

on them to-- to-- develop a NESHAP that is

protective of human health and the environment

and-- and-- and as do all other states as well.

And so, you know, when there is that uncertainty,

we ask them to do their best to eliminate that

uncertainty and speak with one voice. And I think

that's been apparent over the last several months
as they frankly have walked away from some-- that
certainly have walked away from the ambient air
monitoring that they did, and-- and other things.

01:32:40;09          And so, you know, we've-- a lot of elected
officials have-- have urged them to-- to do these
follow-up studies so there can be a-- a
comparison after that control equipment was
installed, with-- with what we know to be the
case beforehand. So, it's-- it's-- it's a
challenge. Everyone is fearful and frustrated.
And I-- and I appreciate that. And it's-- it's
been very difficult for all of us to try and
speak knowledgeably as-- about their position.

                     SEN. DAVID KOEHLER, CHAIR:
01:33:08;16          Well, I-- I guess-- here's what my expectation
is, and-- and-- I know we're gonna be-- in an
administrative change here-- come January. But--
I think that-- for us who deal with Illinois
legislation, that we have to hear truth from the
EPA as to-- you know, I don't expect you to have

experts in all the areas and to try to duplicate
OSHA or-- or-- U.S. EPA.

01:33:35;13          But I do expect that we have an interpretation to
say, yes, this-- we confirm this or no, we think
there's some-- some false here, because we have
to have accurate information if we're to make a--
a-- reasonable decision on this. I-- I think it--
it-- it behooves us that we-- as legislators,
have been confronted with a crisis situation. We
have to take some action. And-- and what we need
to work on is to make sure we take the right
action.

ALEC MESSINA (IEPA):
01:34:04;17          Absolutely. And I couldn't agree more.

SEN. DAVID KOEHLER, CHAIR:
01:34:07;19          Senator Bush?

SEN. MELINDA BUSH:
01:34:10;25          Thank you, Director Messina. I have a couple of
questions. Do we know of other manufacturing--
that uses EO, where we might be dealing with
emissions, in addition to sterilization?

ALEC MESSINA (IEPA):

01:34:22;10        Yes, we do. There are-- four or five-- facilities
                   throughout the state of Illinois that use it in--
                   in various capacities.

SEN. MELINDA BUSH:

01:34:31;04        Okay. And you said something that really piqued
                   my interest for Lake County-- that you are
                   looking at wells-- in DuPage at this point. Where
                   these plants are located, and frankly I'll be
                   going to visit them so I have a better
                   understanding of what's going on and how the
                   processes work, they are located next to
                   communities that are all on private well.
                   Wadsworth abuts Gurnee and is very close to, I
                   believe, the Vanguard plant. So, are we working
                   with the Lake County Health Department?

SEN. DAVID KOEHLER, CHAIR:

01:35:05;12        Can-- can-- can we just pause for one second, go
                   into a regular meeting, and-- adopt your--
                   Senator Bush, your-- motion? Because we're losing
                   our quorum.

MEDIA ID: STERIGENICS-HEARING-3.MP4                          PG. 108

                                    SEN. MELINDA BUSH:

01:35:15;23              I understand.

                                    SEN. DAVID KOEHLER, CHAIR:

01:35:16;13              Okay. Can we do that?

                                    SEN. MELINDA BUSH:

01:35:17;13              Absolutely.

                                    SEN. DAVID KOEHLER, CHAIR:

01:35:18;02              All right-- so make a motion-- motion-- Senator

                         Biss makes a motion, Senator McGuire seconds it

                         (UNINTEL) roll call.

01:35:26;07                          (OFF-MIC CONVERSATION)

                                    SEN. DAVID KOEHLER, CHAIR:

01:35:29;24              All right. So, it's adopted. We'll report it to

                         the-- Senate. So--

                                    SEN. MELINDA BUSH:

01:35:36;07              Thank you.

                                    SEN. DAVID KOEHLER, CHAIR:

01:35:36;21              --go back to your question. Thank you, Senator.

                                    SEN. MELINDA BUSH:

01:35:38;11              You know, I really appreciate all the questions,

                         thank you. So, my question is are we-- in touch

                         with-- the Lake County Health Department--

because obviously we have some concerns about

those communities now.

ALEC MESSINA (IEPA):

01:35:51;12          So, at this point, U.S. EPA has taken the lead in

communicating with those-- county-- county

officials. We've-- obviously I've taken a number

of phone calls, spoken with a number of officials

in those areas as well. But specifically to your

question of the private well testing, you know,

I-- s-- we certainly believe that the well

sampling that we are about to engage in will

confirm what we think will be the case, and that

is that we will not find either ethylene glycol

or ethylene oxide in any-- I want to use-- choose

my words carefully here, in any measurable

amounts.

01:36:29;20          In fact, I was just communicating with-- one of

the-- one of the local groups in the Willowbrook

area working with-- two scientists from Abbot.

And we were exchanging emails about what our

expectations are-- the-- and-- and what we

anticipate finding. I-- I don't think we're going
to see something, but we're looking at this as a
high priority-- but also kind of a test case for
what we would expect to see elsewhere.

SEN. MELINDA BUSH:

01:36:55;02    Okay. And-- can I ask you-- you probably-- you
may or may not know the answer to this. Do you
know if either Vanguard (SIC) or Medline have--
the-- the back venting?

ALEC MESSINA (IEPA):

01:37:05;03    Vantage, yeah.

SEN. MELINDA BUSH:

01:37:06;26    Vantage, excuse me.

ALEC MESSINA (IEPA):

01:37:07;20    Right. No-- no-- so, the-- we've had-- we've sat
down with both of them. I b-- I would expect
developments in both of those cases quickly, but
not-- but-- but not with-- not yet.

SEN. MELINDA BUSH:

01:37:21;12    Okay. And then just one more question. You
slipped against the bill. Can you tell us why,
Director Messina?

                                   ALEC MESSINA (IEPA):

01:37:27;05              Absolutely. Thank you for-- yeah, I tried to

                        address that in my first-- few s-- sentences, I

                        guess. But-- you know, we do have implementation

                        concerns with-- with the language as drafted, but

                        we are 100%-- I, personally, the agency is

                        completely committed, absolutely, unequivocally

                        committed to working with the sponsors to come up

                        with something that is implementable.

                                   SEN. MELINDA BUSH:

01:37:48;28              Okay. And what are the-- are the-- what are the

                        concerns? The implementable concerns

                        specifically?

                                   ALEC MESSINA (IEPA):

01:37:54;22              Right. So, those were the three that I tried to

                        address--

                                   SEN. MELINDA BUSH:

01:37:57;01              Okay.

                                   ALEC MESSINA (IEPA):

01:37:57;07              --but the first one was just-- number one, the

                        agency does not promulgate rules.

SEN. MELINDA BUSH:

01:38:01;16          Okay. Got it.

ALEC MESSINA (IEPA):

01:38:01;24          It's the Pollution Control Board. But even beyond

                     that, it's just-- do we have the technical

                     expertise, or does any state, for that matter,

                     have the technical expertise to develop an

                     emissions standard. As I said, we think that in

                     terms of control technology, but not an emissions

                     standard. So, that was-- that was item one. Item

                     two was this issue of us making determinations as

                     to-- whether there are sufficient alternative

                     sterilizing technologies. That's really an-- you

                     know, that's FDA expertise.

SEN. MELINDA BUSH:

01:38:28;18          Okay.

ALEC MESSINA (IEPA):

01:38:28;26          Certainly we could report back and-- and monitor,

                     but again, making those determinations is

                     probably outside of our purview. And then the

                     third piece was just ensuring that there is

                     sufficient due process, so if the agency were to

                                take that action to revoke a permit, that you

                                know, there was some due process surrounding

                                that.

                                        SEN. MELINDA BUSH:

01:38:44;10             Okay, thank you. I just wanted to make sure I was

                                clear. Appreciate it. Thank you.

                                        ALEC MESSINA (IEPA):

01:38:47;03             Thank you.

                                        SEN. DAVID KOEHLER, CHAIR:

01:38:49;26             Senator Biss. And then I-- understand there is a

                                committee-- waiting to-- yes, but this is

                                important and we're gonna take our time and get

                                it done.

                                        SEN. DANIEL BISS:

01:38:56;27             Thanks, Mr. Chairman. I'll be quick. First--

                                first of all, you mentioned me (LAUGH) and so I

                                feel somewhat compelled to-- re-- respond.

                                        ALEC MESSINA (IEPA):

01:39:05;12             That was a mistake then.

                                        SEN. DANIEL BISS:

01:39:06;08             I mean, I won't respond for long. It'll-- (LAUGH)

                                but you-- you talked about the EPA adjusting some

of its positions recently as an indication of a
lack of internal-- clarity and consensus. Let's
just remember that, notwithstanding the
extraordinary work of-- innumerable scientists
and other highly skilled personnel in the rank
and file of the EPA, from a leadership
perspective, it's being run on behalf of
polluters right now.

01:39:35;06          And so that adjustment in position, which God
willing will instantly change in January of 2021,
is not necessarily reflective of any kind of
internal scientific dispute. The question I
wanted to ask you is about-- you just said
something that piqued my interest and I didn't
totally follow it, to be honest. You talked about
the self-reporting of stack emissions. What is
the role of self-reporting and what's the
appropriateness of self-reporting?

                                   ALEC MESSINA (IEPA):

01:40:10;26          So, to your first point, I-- I-- I totally
appreciate the importance of what you're saying

in terms of science within U.S. EPA. I-- I am
obviously very critical. You know, we're-- we're
very fortunate in the-- the front-line EPA--
Illinois EPA staff is very fortunate to be
working with those same front-line staff, their
counterparts, who have been there, as you well
know, for-- for a long period of time.

01:40:31;19        And so-- I-- I think it's understandable and wise
to have a healthy level (LAUGH) of skepticism,
right. But I would also just add that just
because there's skepticism doesn't mean that
there aren't legitimate issues that are kind of
being worked through. So, I-- I-- I agree with
you.

01:40:46;16                    (SEN. DANIEL BISS: UNINTEL)

                               ALEC MESSINA (IEPA):

01:40:48;01        But as to the self-reporting notion-- yes, the
company is required-- pursuant to the terms of
their construction permit, as well as their
ongoing operating permits, there is regular
monitoring there as well. But yes, they are

required to-- contract with a-- a third-party

vendor who is skilled in the area of conducting

stack testing.


01:41:10;25          Illinois EPA and U.S. EPA both reviewed the

protocol which was required to be submitted

before the stack test occurred to ensure that we

were going to get representative numbers. And we

were present there to watch that as well. I

certainly know that it has-- that-- there has

been a lot of questioning of whether a third-

party vendor can truly be independent-- and those

are questions we h-- have to address all the

time, but it's-- it is the nature of this

particular business that we work in and that's

how that's conducted.

                         SEN. DANIEL BISS:

01:41:40;19          And-- and so you-- you obviously why a person--

                         ALEC MESSINA (IEPA):

01:41:42;29          Oh, gosh--

                         SEN. DANIEL BISS:

01:41:44;04          --naively might have some concern about that.

ALEC MESSINA (IEPA):

01:41:45;06          Absolutely.

SEN. DANIEL BISS:

01:41:45;23          Just for the record, you personally are very
                     confident in the way that process produces--

ALEC MESSINA (IEPA):

01:41:51;15          I-- I personally am confident. And I am also very
                     confident-- you know, I've-- I've-- I've worked
                     at the agency off and on for parts of 20 years
                     and I-- I know the staff personally. I've worked
                     with the staff personally as-- you know, when I
                     was chief counsel before in a previous
                     administration.

01:42:06;21          And I-- I know the staff that-- that reviews the-
                     - these stack test protocols and-- and travels
                     the state on a regular basis to observe and to
                     ensure that there aren't-- that a company isn't
                     playing games, frankly, as they are conducting
                     those tests. And-- and so I have the utmost faith
                     in the agency staff who does that work.

SEN. DANIEL BISS:

01:42:26;18          Me, too. I guess my question is do you have faith
                     in the--

ALEC MESSINA (IEPA):

01:42:29;02          In the contractor?

SEN. DANIEL BISS:

01:42:29;20          --resources that you have and the process to
                     ensure that, in fact, games are not being played
                     by the contractors and the companies?

ALEC MESSINA (IEPA):

01:42:37;10          No, I think that's a great question. You know,
                     we've-- (LONG PAUSE) I will tell you that the
                     last two years, it-- it's something that I'm
                     proud of, that we've worked very hard to-- to
                     fill unfilled positions that have been in place
                     for ten-- and I don't know if this is exactly
                     your question, Senator, but I think it's p-- at
                     least in part.

SEN. DANIEL BISS:

01:43:00;19          It's totally related.

ALEC MESSINA (IEPA):

01:43:01;12          Yeah, so we--

SEN. DANIEL BISS:

01:43:01;16        My question is-- is help me-- help me feel

                   confident that games are not being played. That's

                   my question.

                             ALEC MESSINA (IEPA):

01:43:06;03        I-- I-- I have-- yeah, I-- I-- I don't believe

                   that. I-- you know, I will tell you, I-- again,

                   I-- I know our staff. I-- I-- I've seen them

                   testify in court. I've seen them in action. I've-

                   - I've actually participated in the training

                   that-- that our staff provides to people who

                   conduct stack testing throughout the Midwest, and

                   I'm-- I'm very confident in their ability.

                             SEN. DANIEL BISS:

01:43:27;28        But-- okay, and I-- I don't want-- you were--

                   we're out of time. I just wanted to just-- just--

                   in case anyone's listening, I'm not questioning

                   the ability of your staff. I'm just--

                             ALEC MESSINA (IEPA):

01:43:34;07        Yeah.

                             SEN. DANIEL BISS:

01:43:35;03        --questioning that we have a system in place that

                         makes sure that others aren't playing games--

01:43:37;27                        (OVERTALK)

                         ALEC MESSINA (IEPA):

01:43:38;24              That's why the-- that's why we-- that's why our

                         staff was there, present at that test on both

                         days.

                                   SEN. DANIEL BISS:

01:43:43;11              I hear you. Thank you.

                         ALEC MESSINA (IEPA):

01:43:44;17              You're welcome. Thank you.

                         SEN. DAVID KOEHLER, CHAIR:

01:43:45;29              All right. Thank you-- Director, and-- thank you,

                         every, who-- testified or has listened. Thank

                         you, Senator Curran. Thank you, Senator Bush. I

                         know that you have-- facilities in-- in your area

                         as well. Let me just say that-- the House-- had a

                         hearing. They may or may not be bringing

                         something forward-- so we'll wait and see as to

                         whether we take any action-- come two weeks from-

                         - from now when we come back. So-- with that, I'm

                         gonna adjourn the meeting. Thank you.

                                   (BREAK IN TAPE)

MEDIA ID: STERIGENICS-HEARING-3.MP4                                      PG. 121

* * *END OF TRANSCRIPT* * *